UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

HOWARD M. KERSTINE                :
                                         :                CASE NO.  C-1-02-080
                 Plaintiff           :                   Judge Weber
                                         :
vs.                                    :
                                         :                JOINT FINAL PRETRIAL
NINE WEST GROUP, INC.       :                ORDER
JONES APPAREL GROUP      :
                                         :
                 Defendants     :

This matter is before the Court pursuant to Rule 16 of the Federal Rules of Civil Procedure.

I.      APPEARANCES:

For Plaintiff:

      Paul Tobias, Esq.
      David D. Kammer, Esq.
      Tobias, Kraus & Torchia
      414 Walnut Street
      Suite 911
      Cincinnati, Ohio 45202
      (513) 241-8137
      (513) 241-7863 (fax)

For Defendant:

      Gary L. Greenberg, Esq.
      Denlinger, Rosenthal & Greenberg
      2310 Firstar Tower
      425 Walnut Street
      Cincinnati, Ohio 45202
      (513) 621-3440
      (513) 621-4449 (fax)

      Conrad S. Kee, Esq.
      Jackson Lewis Schnitzler & Krupman
      177 Broad Street
      P.O. Box 251
      Stanford, Connecticut 06904
      (203) 961-0404
      (203) 324-4704 (fax)

II.    NATURE OF ACTION AND JURISDICTION:

    A.    This is an action for damages caused by wrongful termination based on age discrimination in violation of the following federal and state anti-discrimination statutes: the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; state law claims under Ohio Revised Code § 4112.02(N) and § 4112.99; a common law public policy claim; and a breach of promise, causing detrimental reliance in violation of Ohio law governing promissory estoppel.

    B.    The jurisdiction of the Court is invoked under Title 28 U.S.C. § 1331.   The Court's supplemental jurisdiction over Plaintiff's related state law claims is based on Title 28 U.S.C. § 1367.

    C.    The jurisdiction of the Court is not disputed.


III.   TRIAL INFORMATION:

    A.    The estimated length of trial is five to seven days.

    B.    Trial to Jury will begin in December, 2003.


IV.    STATEMENT OF THE CASE:

    A.    Plaintiff's Statement of the Case

Plaintiff Howard Kerstine, now age 60, has worked in the shoe industry for over 35 years.  He lived and worked in Cincinnati at the time of his termination.  He now works as a salesman for Mark Lemp Footwear, Inc., traveling throughout the Western United States.  He lives with his wife Marilyn in Prescott, Arizona.

Defendant Nine West Group, Inc. ("Nine West") is a corporation with headquarters in White Plains, New York.  Defendant Jones Apparel Co. ("Jones") owns Nine West and is its "parent" corporation.

In 1966 Kerstine was hired by U.S. Shoe Corporation ("U.S. Shoe"), where he worked continuously until 1987.  After leaving to work as an executive with two similar operations, Kerstine returned to U.S. Shoe in 1992 as Sales Manager for the Easy Spirit division.  In 1996 Kerstine was promoted to Vice President of Sales for Easy Spirit.  In 1995 Nine West purchased U.S. Shoe.  In 1999, Jones purchased Nine West.

Kerstine had a quadruple heart bypass operation in 1997, missing only three months of work.  When Plaintiff returned as VP of Sales, he resumed working harder than ever, putting in 12-hour days and 6-day weeks.  At that time, Kerstine lived in Cincinnati but commuted to Defendants' headquarters, which had recently moved to White Plains, New York.  Top management discussed having Kerstine to spend more time there, but considered the option of assigning him the lower Midwest Regional Sales Director ("RSD") position and replacing him as VP of Sales.

In 1998, Richard Paterno, then Easy Spirit's number two ranking agent as Executive Vice President of Sales, gave Kerstine three options: (1) he could continue as VP of Sales working in Cincinnati; (2) he could move to White Plains as VP of Sales; or (3) he could "take the region down in Ohio [as RSD] and . . . stay there and just do that as long as you want until he retired."  From that point on, Kerstine continued to discuss these options with Paterno, who relayed their conversations to Joe Dzialo, Easy

Spirit's President and highest-ranking employee. Kerstine gave considerable thought to this major life decision, and repeatedly asked Paterno to clarify what he meant, each time receiving the answer that Paterno intended for him to have lifetime job security until he retired if he took the lower RSD position. Paterno confirmed these conversations in his deposition.

Thus, due to business and personal considerations, and based upon multiple promises of job security from top management, Plaintiff took a step down from VP of Sales to RSD of the Midwest Region in 1998. The demotion involved less pay, less benefits, and loss of prestige.

In October 1999 Plaintiff received a job offer from another company. At that time, Plaintiff consulted with Paterno, who reaffirmed the 1998 promise, saying that Plaintiff indeed had a job for life until retirement. Based on this reaffirmation, Kerstine turned down the offer and remained with Defendants.

As would be expected, Plaintiff was an excellent RSD due to his personal talents and top management experience. Kerstine's record of performance is unparalleled and undisputed. While in his executive sales roles Kerstine performed exceptionally well, serving with distinction by all accounts. He was instrumental in implementing and promoting the use of computers in the industry and forged strong relationships with major department stores and independent retailers. His sales record was consistently outstanding. He was – by far – the most experienced of the eight Easy Spirit RSD's, being the only RSD with top management experience.

In June 2001 Jones ordered Nine West to streamline its operation and reduce costs in order to increase current profits. Despite his obvious experience, talents, and importance to the division, Kerstine was selected for termination during this Reduction in Force. He was selected because of his age. At age 59, Plaintiff was the eldest among the Easy Spirit RSDs and one of the oldest Nine West employees.

There is substantial evidence that Defendants were hostile toward older workers and treated younger workers more favorably.

Defendants allege that the layoff decision was based on a measurement that had never before been used to measure the importance of Easy Spirit sales personnel, the size of accounts within a region. The testimony of several witnesses and Defendants' own agents expose this explanation as unreasonable and pretextual. There were actually multiple decisions that needed to be made: (1) How should the regions be restructured? (2) Who would be assigned to the accounts? and (3) Who should be terminated? Discriminatory age bias infected each of these decisions.

In restructuring the region, Defendants consolidated Kerstine's territory with that of Charles Farris. Farris was then 41 – 18 years younger than Kerstine. Any comparison between the abilities of the two RSDs would have revealed the fact that Kerstine was obviously more qualified for the position. However, tellingly, there was no discussion of retaining Kerstine. Nor was there any review of the files to determine which employee should be retained. Instead, the decision was "automatic" – the older employee was terminated.

In assigning the accounts, Defendants chose to retain Kerstine's former subordinate: the then 39 year-old Robert Deaton, 20 years younger than Kerstine. Deaton took over Kerstine's accounts. There was absolutely no discussion of retaining Kerstine, who was vastly more qualified and experienced. Again, the decision was "automatic" – the older employee was terminated.

In deciding who should be terminated, the final results of the process reveal the true reason for the decision, which was to eliminate the older RSDs. Indeed, two of the oldest RSDs – Kerstine, age 59; and Richard Halperin, age 49 – were terminated as a result. Kerstine was the oldest of Easy Spirit's RSDs. Again, the decision was "automatic" – the older employee was terminated.

Additionally, Defendants discriminated against Kerstine by failing to transfer him – or to even consider him for a transfer – to another position.  Defendants had a policy of considering candidates for layoff for other open positions.  In fact Defendants admit that 14 younger Nine West employees were indeed transferred in lieu of layoff.  Nelson, Deaton and Castro Easy Spirit employees were slated for layoff but were retained to fill openings.  Defendants concede that Plaintiff was not even considered for any kind of transfer.

Kyri Fujiwara, age 32, obviously less qualified than Kerstine, was temporarily filling an opening as RSD on the West Coast.  Kerstine was not even considered for the permanent opening.  Defendants now say its policy did not permit relocation.  Yet, Defendants admit the so-called policy was not iron clad and Fujiwara herself was permitted to relocate from California to Wisconsin.

<u>At the time of Plaintiff's termination, there were at least six openings that could have been assigned to Plaintiff but were instead filled by employees substantially younger and clearly less qualified than Plaintiff</u>.  Yet the testimony of Defendants' own agents reveals that Defendants never once considered, discussed or even mentioned Plaintiff as a candidate for any of these positions.  Predictably, the decision was "automatic" – the older employee was terminated.

Plaintiff was terminated as a direct result of his age in violation of the ADEA, parallel provisions in the Ohio Revised Code, O.R.C. §§ 4112.02(N) and 4112.99, the policy of the State of Ohio.  Finally, Plaintiff claims a breach of promise, causing detrimental reliance in violation of Ohio law governing promissory estoppel.

Plaintiff has suffered substantial economic and emotional damages and is also entitled to liquidated and punitive damages and attorney fees.

B.    <u>Defendants' Statement of the Case</u>

V.    <u>TRIAL DETERMINATIONS:</u>

A.    <u>FACTS</u>

1.    <u>Stipulated Facts:</u>

The parties stipulate as to the following facts.

1.    Plaintiff Howard Kerstine has worked in the shoe industry for over 35 years.

2.    Kerstine lived and worked in Cincinnati, Ohio, at the time of his termination.

3.    Kerstine currently works for Mark Lemp Footwear, Inc., as a shoe salesman traveling the Western States.

4.    Kerstine lives with his wife Marilyn in Prescott, Arizona.

5.    Defendant Nine West Group, Inc. ("Nine West") sells women's footwear, accessories and jewelry.

6.    Nine West has a retail division with over 700 retail outlets.  Its wholesale group has numerous divisions.  It employs 600 to 700 employees.

7.    Nine West's headquarters are in White Plains, New York.

8.    Defendant Jones Apparel Co. ("Jones") is engaged in a wide variety of retail and wholesale functions.  Its headquarters are in Bristol, Pennsylvania.

9.    Jones is the owner of Nine West.  Jones is the "parent" corporation of Nine West.

10.   Jackie Nemerov was the Vice President of Jones in the summer of 2001.

11.   Aida Tejero-DeColli was the Senior Vice President of Human Resource for Jones in the summer of 2001.

12.   Susan Itzkowitz was the President of Nine West in the summer of 2001.

13.   Muriel "Mim" Schreck was the President of Nine West's Easy Spirit Division in the summer of 2001.

14.   Jacqueline "Jackie" Orris was the HR Director for Nine West in the summer of 2001.  She currently holds the same position.

15.   The HR Director for Nine West reports directly to the HR Director for Jones.

16.   Geoffrey Ward (age 34) was an Easy Spirit RSD with responsibility for the West Coast prior to May 2001.  In May 2001 Ward was promoted to be VP of Sales for Easy Spirit and relocated to White Plains, New York.

17.   Robert "Bob" Deaton (Age 39) was an Account Executive under Plaintiff in the Midwest region prior to August 2001.

18.   Deaton was slated by Defendants for layoff in the RIF of August 2001.  Instead, on August 7, 2001, Deaton was chosen to fill a new sales position created by the layoff of Plaintiff and the resignation of Anne Hoskins.  Deaton took over all of Plaintiff's accounts.

19.   Amy Castro (age 27) was a Salesperson slated for layoff in August 201.

20.   Instead of being laid off, Castro received a transfer in lieu of layoff.  Castro filled a sales position in the Midwest area for which Kerstine was more qualified around the time Plaintiff was terminated.

21.   Plaintiff was hired by U.S. Shoe Corporation ("U.S. Shoe") in 1966.

22.   Kerstine rose through the ranks to become National Sales Manager for Red Cross Shoe Division of U.S. Shoe, the largest shoe division in the United States, with responsibility for 42 to 47 sales employees.

23.   After leaving in 1997 to take executive sales positions with Wohl Branded Sales, and Craddock-Terry, Inc. Shoe Co., Kerstine returned to U.S. Shoe in 1992.  He then served as Sales Manager for the Easy Spirit Division of U.S. Shoe.  At that time, he shared responsibility for about 50 employees in the national sales and service force.  In 1996 he was promoted to Vice President of Sales for Easy Spirit.

24.   In 1995 Nine West purchased U.S. Shoe. In 1999, Jones purchased Nine West.

25.   While in his executive sales roles Kerstine provided sales management for major department stores such as Federated, Belk, DHMF, SAKS, Mercantile,

Catalogues, Military, Elder-Beerman, and others, as well as for all Independent Store accounts.

26. Among Kerstine's many important accomplishments was a key role in implementing the first computer system used by the Red Cross, Cobbies and Easy Spirit Divisions of U.S. Shoe.

27. In 1997 Kerstine had a quadruple heart bypass operation. He missed three months of work. However, he came back strong and continued on as VP of Sales.

28. Plaintiff was demoted in 1998, taking a position as Regional Sales Director ("RSD"), a lower-rated and lower-paying position.

29. In June 2001 Jones Apparel requested that Nine West streamline its operation and reduce costs. At that time, Nine West was making a profit. The intent was to maximize profits.

30. Muriel "Mim" Schreck, President of Easy Spirit, made the decision as to who would be terminated within her division.

31. On July 5, 2001, Schreck produced an initial list of layoffs among the Easy Spirit sales personnel. The list was finalized August 7, 2001.

32. Of the 11 Easy Spirit sales employees over age 40, four were terminated, including Plaintiff. Of those 20 employees under age 40, however, only five were terminated.

33. There was no discussion of any comparison between the abilities of Farris age 41 and Kerstine age 59 or who was best qualified to handle the new merged territory.

34. There was no discussion or consideration of transferring Kerstine in lieu of layoff, to a lower-rated position or otherwise.

35. Kerstine began working for the Easy Spirit division of U.S. Shoe as a Sales Manager in 1992 when he was 50 years of age.

36. Nine West acquired the Easy Spirit brand from U.S. Shoe in approximately 1995.

37. Plaintiff subsequently became an employee of Nine West when it acquired the Easy Spirit division from U.S. Shoe.

38. Nine West was acquired by Jones on approximately June 15, 1999.

39. By November 1996, Kerstine was Vice President of Sales and at that time, he was 54 years of age.

40. As VP of Sales, Kerstine reported directly to the Executive Vice President of Sales, Richard "Rick" Paterno.

41. The President of Easy Spirit at that time was Joe Dzialo.

42. When Nine West acquired Easy Spirit, Dzialo and Paterno relocated to White Plains, New York, where Nine West had its headquarters.

43. Kerstine remained in Cincinnati, Ohio, and frequently traveled to New York.

44.  In or about July 1999, Easy Spirit implemented a significant reduction in force and as a result, several long term employees were terminated.

45.  In July 1999, Kerstine turned 57 years of age.

46.  In the fall of 1999, an account executive who had been previously working in the Midwest region was transferred to another region, and as a result, Kerstine had only one Account Executive with whom he covered his sales region.

47.  Paterno reassigned the Proffitts group of department stores out of Kerstine's region to another RSD who was working out of Atlanta.

48.  After this reassignment,Kerstine's sales region still included two major accounts, Elder-Beerman department stores and the Shoe Corporation of America, which leased space in various department stores.

49.  Plaintiff had discussions with a company known as Softwalk regarding an alternative position.  Plaintiff was unable to reach an agreement for that job because Softwalk was unwilling to enter into a three-year written employment agreement.

50.  In May 2001, Mim Schreck became the President of Easy Spirit, replacing Paterno who had become President sometime before 2001.

51.  By 2001, Plaintiff was fully recovered from his heart surgery, was able to do a hundred pushups every day and fifty sit-ups every day as well as swim and run.

52.  Before Schreck became President of Easy Spirit, the division tracked sales by giving credit to RSDs for all shoes shipped to their region for sale.

53.  Schreck received no criteria or guidance as to how to achieve the RIF's stated goal.

54.  At that time, the Easy Spirit field sales organization consisted of three main positions: Marketing Associates, Account Executives and RSDs.

55.  In June or July of 2001, within the field sales organization, there were eight RSD positions, seven Account Executive positions, and approximately 15 Marketing Associate positions.  In addition, there was one position known as the Special Wholesale Manager who was responsible for selling to the Army, Navy, Air Force and Marines.

56.  Schreck did not review the personnel files or performance evaluations of the RSDs prior to making her decision regarding layoff.

57.  As a result of the elimination of Kerstine's position, responsibility for his single major account, Elder-Beerman and his other accounts was transferred to Robert Deaton.

58.  Kerstine's responsibilities for supervising Deaton were assumed by another RSD, Charles Farris, for a short period of time.

59.  Deaton and Farris kept their old duties and performed Kerstine's duties in addition to their previous responsibilities.  Deaton also began performing most of

the duties previously performed by another Account Executive who had recently resigned, Anne Hoskins.

60. The following are the correct ages for selected employees of Defendants, as provided by Counsel for Defendants: Abiba Kindo, 24; Melanie Saraco, 28; Angela DeJulio 39; Amy Nelson, 27; Carmine Gencarelli, 36; Mark Hoffman, 26; Ana Logan 31; Karl Scherer, 50; Alanna Monroe, 28; Ray Doane, 51; Emerson Becker, 32; Fiona Doohan, 29; Meredith Sullivan, 25; Nicole Kornfeld, 30; Jeffrey Pearce, 37; Anne Morrisey, 40.

61. Defendants' concedes that "of 33 [Nine West] employees whose jobs were eliminated in [August 2001], 11 or 12 of those employees received different positions at Nine West." Each of these employees transferred to a different position in lieu of layoff was substantially younger than Plaintiff.

62. The following employees are examples of employees who were transferred in lieu of layoff. Amy Nelson (age 26) of Easy Spirit moved to Bandolino. Mark Hoffman moved to Nine West brand. Melanie Saraco, age 28, went from Jervin to Specialty Marketing in August 2001. Abida Kindo, age 24, was transferred from Specialty Marketing to Enzo on August 8, 2001. Angela DeJulio, age 39, went from Jervin to Corporate Sourcing on August 8, 2001. Carmine Gencarelli, age 36, was transferred from MIS September White Plains, New York to Nine West Headquarters in Bristol, Pennsylvania. All of these employees were substantially younger than Plaintiff.

63. There were 12 Easy Spirit Sales Employees slated for layoff on July 5, 2001. These included Deaton, Castro and Nelson, all under age 40, who were selected to fill openings. None of the four employees over age 40, Parks, Halperin, Williams, or Plaintiff, were even considered for transfers in lieu of their layoff.

64. For the year 1999, sales to Proffits stores increased by 19%. Sales to Elder Beerman Stores increased by 25%.

65. At age 59, Plaintiff was the oldest employee of the several hundred employees at Nine West, except for two high-ranking Vice Presidents.

2.    Disputed Facts:

The parties dispute the following facts.

a.    Plaintiff [facts that Plaintiff says are true but are disputed by Defendant]:

66. Richard "Rick" Paterno is the former President and Executive VP of Easy Spirit. During his tenure he made an agreement and promise that Plaintiff would have a job until retirement.

67. There were eight Easy Spirit Regional Sales Directors ("RSDs") in July 2001: Howard Kerstine (age 59); Richard Halperin (age 49); Bob Terbrock (age 55); Jerry Hemphill (age 54); Janine Riley (age 50); Charles Farris (age 41); Kyri Fujiwara (age 32) and Steven Falk (age 37).

68.   Kyri Fujiwara (age 32) was an Account Executive under Ward on the West Coast. Fujiwara took over responsibility for the West Coast after Ward's promotion. At that time Fujiwara had less than five years of experience.

69.   Fujiwara temporarily filled the West Coast RSD position in early June 2001 and was officially promoted on August 13, 2001, around the time Plaintiff was terminated. Kerstine was more qualified for this position but was not considered.

70.   Suzanne Fonarow (age 44) filled an open position as Director of Sales & Marketing for Enzo, a division of Nine West, on August 13, 2001, around the time when Kerstine was terminated. Kerstine was qualified for this position, but was not considered by Defendants.

71.   Arthur Parks (age 54) is a Salesperson who was terminated around the time of Plaintiff's termination. Parks, like Kerstine, was also a victim of age bias.

72.   Richard Wall (age 53) is a Salesperson who was demoted in May 2001 and terminated in October 2002. Wall, like Kerstine, was also a victim of age bias.

73.   Plaintiff was living in Cincinnati, Easy Spirit's headquarters. After Easy Spirit's 1996 move to White Plains Kerstine commuted to White Plains a few days a week, and traveled the rest of the country in the remaining time. Nine West wanted him to spend more time in White Plains, but also was considering the option of assigning him the Midwest RSD position and replacing him as VP of Sales.

74.   In 1998 Rick Paterno, then the Executive Vice President of Sales for Easy Spirit, discussed Plaintiff's future with him, giving him three options: he could (1) maintain the status quo as VP of Sales commuting from Cincinnati; (2) move to White Plains as VP of Sales; or (3) stay in Cincinnati and become the RSD for the Midwest region, where he could stay as long as he wanted until he retired.

75.   Kerstine accepted Paterno's offer to step down to the RSD position based partially on the job security provided by the offer.

76.   Joe Dzialo, then the Easy Spirit Division President, was aware of the promise and confirmed the offer to Plaintiff.

77.   Kerstine's salary was reduced when he stepped down to RSD. His car allowance was also reduced. He also accepted a lower bonus potential and lower deferred compensation. He also gave up the prestige of VP status, which was very important to him.

78.   Paterno told Plaintiff that if he took the RSD position he could work as long as he wanted until he decided to retire.

79.   Kerstine advised Paterno and Dzialo of his decision to accept the demotion on July 30, 1998.

80.   Plaintiff accepted the RSD position based partially on the Company's promise of employment until retirement.

81. Plaintiff received a job offer from Old Main Trotter's and Daniel Green Footwear, a company interested in launching a new division called "Soft Walk." The formulation for this offer occurred in late 1999 and early 2000.

82. President Paterno reaffirmed his promise of lifetime employment on October 30, 1999, during the period in which Plaintiff was contemplating taking a possible position with Soft Walk.

83. In or about October 1999, Kerstine had a conversation with his supervisor, Paterno, who stated "[I]t was his intention to allow me to continue in this capacity, here in Cincinnati, until I decided to retire. He said that he fully intended to protect me and my position here."

84. Kerstine turned down the "Soft Walk" offer because there was none of the job security he had as a result of the promise of employment with Nine West until he retired.

85. Plaintiff's performance for the Company was outstanding. His sales record was consistently the best among his peers.

86. During the period in which Plaintiff served as an RSD his record of sales continued to be excellent. His accounts averaged an increase of 22% per year, higher than the other RSDs' increases.

87. For the year 1997 Plaintiff's sales also increased: Elder Beerman was up 92%; Proffits Stores were up 34.5%; and Belk was up 15%.

88. For the first six months of 2001, from January 1 through June 30, 2001, Plaintiff's record of shipments was up 20% from the previous year, the highest percentage increase in the Division. Bookings, or sales, on his first spring trip in 2001 were up 66%.

89. At the Las Vegas Shoe Show in late July and early August 2001, Plaintiff sold more shoes than any other of the sales personnel of Easy Spirit present at the show.

90. There were approximately 31 sales personnel in the Easy Spirit Division.

91. The decision as to which Account Executives and Marketing Associates should be terminated was based on a number of factors including performance, often keeping the strongest and eliminating the weakest. However, the decision as to which RSDs would be terminated was handled differently and tainted by age discrimination.

92. Easy Spirit President Paterno had previously informed Plaintiff that Nine West had an unfriendly attitude toward older employees.

93. Plaintiff could have handled the new territory consisting of his territory and Farris' territory. Plaintiff could have handled the Dillard's accounts, assigned to Falk. Plaintiff was more experienced and qualified than either Farris or Falk.

94. Defendants have a policy and practice of considering transfer in lieu of lay off.

95. Nine West followed that policy for younger employees concerning the August 2001 RIF – but not for Plaintiff.

96. Amy Castro, age 27, was also on the July 5, 2001 termination list. Castro was an Account Executive who lived in Chicago, also within Falk's region. At that time, Falk, age 37, was designated as the Key Account Executive for Dillards, which left an opening in the Midwest Region. Castro was taken off the termination list and promoted to become an Account Executive with responsibility for the many independent stores in the Midwest, a position for which Plaintiff was extremely well qualified. Plaintiff was never considered for this position.

97. In July 2001 there was an opening for the Director of Sales for Enzo, another Nine West wholesale footwear division. On August 13, 2001 Suzanne Fonarow, age 44, and substantially younger than Plaintiff, was moved into that position. Plaintiff could have done the job. Plaintiff was never considered for this position.

98. Soon after Kerstine's termination, Defendants filled the position of Director of Sales for Easy Spirit by hiring Anne Morrissey, about age 40, also substantially younger than Plaintiff. Kerstine had previously preformed a similar position and could have performed this job. Plaintiff was never considered for this position.

99. Defendants had no iron-clad policy prohibiting employee relocation. Ward was relocated from the West Coast to White Plains at Defendants' expense in May 2001. Fujiwara relocated from California to Minnesota sometime in 2002.

100. Upon his termination, Kerstine specifically asked VP of Sales Glen Ross to be considered for other positions. His request was denied.

101. Kerstine would have considered a lower rated job, even if it involved relocation at his own expense.

    b.    Defendant [facts that Defendant says are true but are disputed by Plaintiff]:

B.    <u>APPLICABLE PROPOSITIONS OF LAW:</u>

    1.    <u>Agreed Applicable Propositions of Law:</u>

The parties agree as the following applicable propositions of law.

Age Discrimination

The Plaintiff claims that the Defendants discriminated against him by terminating him because of his age.

The law makes it unlawful for an employer to discriminate against an employee who is over the age of 40 because of that employee's age. This means that an employer may not select an employee for termination based, wholly or partially, on the basis of the employee's age.

Plaintiff has the burden of proving by a preponderance of the legal evidence that his age was a motivating factor in Defendants' decision to terminate him. In an age discrimination lawsuit under federal law, Plaintiff can prove his case by showing the following by a preponderance of the legal evidence:

(1) That Plaintiff was over 40 years of age;

(2) That Plaintiff was terminated;

(3) That Plaintiff was qualified for the job he held; and

(4) That the termination of Plaintiff allowed Defendants to retain younger employees or Plaintiff was treated differently than similarly situated younger employees or Plaintiff was replaced by a substantially younger employee.

Plaintiff may establish his claims by direct or circumstantial evidence.

Plaintiff may establish his claim of age discrimination by circumstantial evidence if the circumstantial evidence is sufficient to prove by a preponderance of the legal evidence that his age was a motivating factor in the Defendants' decision to terminate him.

If Plaintiff establishes the foregoing, the Defendants must present some legitimate, non-discriminatory reason for the decision to terminate him. The trier of fact is not obligated to believe the reasons set forth by the Defendants to justify their decision. It may look at the legal evidence presented at trial and decide whether the reasons put forth are the true reasons, or if those reasons are false, unworthy of credence, or are themselves motivated by stereotypical assumptions about employees of Plaintiff's age or other indications of age discrimination.

Selection for Layoff

The Plaintiff claims that the Defendants discriminated against him by selecting him for layoff rather than other younger employees based on his age. In situations involving layoff, one way an employer violates the ADEA is when it treats younger employees more favorably than older employees in making layoff decisions based on age. The jury may consider evidence that the Defendants treated younger employees more favorably than they treated the Plaintiff in making their layoff decisions as evidence of age discrimination.

Failure to Transfer

The Plaintiff claims that the Defendants had a policy of considering employees in lieu of layoff and transferred younger employees during the lay off period, but that the Defendants did not consider Plaintiff for transfer because of his age. An employer violates the ADEA when it transfers other displaced employees but does not place a plaintiff in an open position because of age discrimination. If the jury decides that the Defendants did not consider Plaintiff for job openings and transferred younger workers to open positions while denying Plaintiff the same opportunity, this may be considered as evidence of age bias. The jury may also consider the hiring of younger employees for open positions, rather than transfer of Plaintiff, as evidence of age discrimination.

Determining Factor

The Plaintiff need not show that his age was the sole or exclusive factor in Defendants' decision to terminate him. There may have been more than one factor that motivated the defendant. In order to prove age discrimination, Plaintiff must prove by a preponderance of the legal evidence that one such factor was his age and that age made a difference in the determination of whether he was to be selected for termination.

Circumstantial Evidence

In addition, the Plaintiff is not required to produce direct evidence of unlawful motive. Intentional discrimination, if it exists, is seldom admitted, but is a fact that may be inferred from the existence of other legal evidence. The Plaintiff must only prove by the greater weight of the evidence that age was a determining factor for his termination.

Direct Evidence

If the jury finds that the Plaintiff has proven by the greater weight of direct evidence that he was terminated on the basis of age, then Plaintiff prevails, unless the Defendants prove by the greater weight of the evidence that the Plaintiff would have been terminated independent of his age. In doing so, the jury should consider all the facts and circumstances in evidence.

Stereotypes

Another way Plaintiff can establish employment discrimination based on age is to prove by a preponderance of the legal evidence that Defendants based their decision on stereotypical, untrue views of the Plaintiff.

Multiple Decision Makers

The fact that some of the persons who participated in the decision-making process regarding the Plaintiff's termination did not make the "final" decision to terminate him does not insulate the Defendants from a finding of discrimination. So long as a person anywhere in the chain of events leading to the decision acting within the scope of his or her employment was influenced or motivated by the Plaintiff's age in giving his or her input, the trier of fact may determine the ultimate decision was discriminatory.

Damages – Back Pay

If Plaintiff prevails, he is entitled to recover lost wages and benefits, including any increases in wages or benefits lost because of discrimination. The amount of wages and benefits due is determined by calculating the amount that would have been earned from the date of the termination to the date of the verdict. Plaintiff should recover all forms of compensation that the Plaintiff proved he would have earned, but for his termination, including salary, bonuses, vacation pay, pension, health insurance and other benefits. In determining the amount of back pay, there should be deducted the amount of wages and benefits received from replacement income during the period of back pay awarded.

Front Pay

If the jury finds for the Plaintiff, the jury shall consider an award of front pay. Front pay includes the amount the Plaintiff would have earned from the date of the verdict until of find the Plaintiff's loss of future pay and benefits will cease. Among the factors to be considered in deciding the amount of front pay are the following: (1) the age of the Plaintiff; (2) salary and other tangible benefits, such as bonuses and vacation pay; and (3) the replacement value of fringe benefits. In determining the amount of front pay, there should be deducted the amount of wages and benefits that will be received from replacement income during the period of front pay awarded.

Compensatory Damages – General

If Plaintiff obtains a verdict, he should be awarded an amount of money that will reasonably compensate the Plaintiff for the actual injury proximately caused by the conduct of the Defendants.

Compensatory Damages – Emotional Suffering

In deciding this amount the jury may consider the nature, character, seriousness and duration of any emotional pain, suffering, anxiety, inconvenience, metal anguish, and loss of enjoyment of life the Plaintiff may have experienced.

### Compensatory Damages – Future or Permanent Injury and Expense

The Plaintiff also claims that he will experience emotional pain in the future. The jury may return a verdict for any future injury or damages by the greater weight of the evidence that the injury or damages are reasonably certain to occur and were the proximate result of the Defendants' conduct.

### Liquidated Damages – Willful Violation

If the jury determines that the Plaintiff has met his burden of proving that age was a motivating factor in the decision to terminate him, then you will proceed to make an additional determination of whether the Defendants acted willfully.

Plaintiff bears the entire burden of proving by a preponderance of the legal evidence that Defendants acted willfully.

In order to establish that Defendants acted willfully, the Plaintiff must prove by a preponderance of the legal evidence that the Defendants knew or showed reckless disregard for whether their conduct was forbidden by the law.

In determining whether the Defendants acted willfully, the jury may consider omissions, and all of the facts and circumstances.

### Punitive Damages

If the jury finds by clear and convincing legal evidence that the Defendants intentionally discriminated against Plaintiff, the law allows the jury to award punitive damages.

The purpose of an award of punitive damages is, first, to punish a wrongdoer for misconduct and, second, to warn others against doing the same.

In this case the jury may award punitive damages if it finds by clear and convincing legal evidence that the Defendants engaged in an unlawful discriminatory practice with actual malice or callous indifference to the rights of Plaintiff to be free from intentional discrimination.

Callous indifference means "conscious" or "deliberate" indifference to the protected rights of the Plaintiff or disregard of a high degree of danger to the Plaintiff's rights about which the Defendants know or which would be apparent to a reasonable person.

"Actual malice" is defined as either (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights of other persons that has a great possibility of causing substantial harm.

If the jury determines by the legal evidence received in the case that Defendants' conduct justifies an award of punitive damages, it may award an amount of punitive damages that all jurors agree is proper. The amount that the jury determines must be reasonable. Sympathy for or dislike of any party in the case must not guide the jury.

### Promissory Estoppel

The Plaintiff claims that the Defendants made a promise that he would have a job until he wanted to retire upon which he relied, and Defendants should be bound by that promise. The jury can find for the Plaintiff if the jury finds by the greater weight of the evidence that:

1) The Defendants promised that he would have a job until he wanted to retire;

2) The Defendants knew or should have known that the Plaintiff would act in reliance on that promise;

3) The Plaintiff did act in one of two ways:

   a) By accepting the lower-paying, lower-rated job as Regional Sales Director and staying in Ohio; and/or

   b) Declining or failing to fully investigate other employment possibilities in reasonable reliance on the Defendants' promise;

4) The Plaintiff's act was detrimental to him; and

5) Injustice will result if the Defendants' promise is not enforced.

On the other hand, the jury will find for the Defendants if the Plaintiff failed to prove any of the foregoing facts by the greater weight of the evidence, or if the jury determines that the evidence is evenly balanced.

### Expectation Damages

If the jury finds by the greater weight of the evidence that the Defendants broke the promise of employment until retirement, the Plaintiff is entitled to damages in the amount sufficient to place him in the same position in which he would have been if the promise had been fully performed by the Defendants to the extent that the damages are reasonably certain and reasonably foreseeable.

### Damages – Lost Wages

Lost wages are calculated by deciding what the Plaintiff was entitled to receive had the promise been performed.  The jury should then add other damages, if any, suffered by the Plaintiff as a result of the broken promise by the Defendants.

If Plaintiff shows that Defendant acted intentionally, the jury may award double  damages and lost benefits and lost benefits twice the amount of back pay and front pay.

2.    <u>Disputed Applicable Propositions of Law:</u>

The parties dispute the following applicable propositions of law.

   a.    Plaintiff states the following propositions of law are correct but Defendant says they are in error in whole or in part:

   b.    Defendant states the following propositions of law are correct but Plaintiff says they are in error in whole or in part:

<u>WITNESSES:</u>

The parties have listed on the appropriate appendices (**Plaintiff's Appendix A**; **Defendant's Appendix B** those persons who will be called or who will be available to testify.

The parties reserve the right to call without prior notice to opposing counsel rebuttal witnesses whose testimony could not reasonably be anticipated.

C.    EXPERT WITNESSES:

The Plaintiff does not anticipate calling upon any expert witnesses during trial.

D.    EXHIBITS:

The parties will offer as exhibits those items listed on appendices hereof as follows:

(1)    Joint Exhibits: Appendix C

(2)    Plaintiff's Exhibits: Appendix D

(3)    Defendants' Exhibits: Appendix E

E.    DEPOSITIONS:

Plaintiff will offer by deposition portions of the testimony of Susan Itzkowitz, Jacqueline Orris, Richard Paterno, Muriel "Mim" Schreck, and Geoff Ward including portions set forth in the Appendix to Plaintiff's response to Defendant's motion for Summary Judgment (see Appendix F) and the Parties' final designations will be furnished 15 days prior to trial.

F.    DISCOVERY:

Discovery has been completed.

G.    PENDING MOTIONS:

Plaintiff has filed a Motion to Amend the Complaint.  Defendants have filed a Motion for Summary Judgment.  Both motions are pending at this time.

IV.    SETTLEMENT EFFORTS:

The parties have made a good faith effort to negotiate settlement, including but not limited to attending a mediation session conducted by Magistrate Judge Hogan, but have not reached an agreement at this time.

Respectfully submitted,

_____
Paul H. Tobias – 0032415
David D. Kammer – 0061808
Tobias, Kraus & Torchia
414 Walnut Street
Suite 911
Cincinnati, Ohio 45202
(513) 241-8137
(513) 241-7863 (fax)
Attorneys for Plaintiff

_____
Gary L. Greenberg – 0023180
Denlinger, Rosenthal & Greenberg
2310 Firstar Tower
425 Walnut Street
Cincinnati, Ohio 45202
(513) 621-3440
(513) 621-4449 (fax)
Attorney for Defendants

_____
Conrad S. Kee
Jackson Lewis Schnitzler & Krupman
177 Broad Street
P.O. Box 251
Stanford, Connecticut 06904
(203) 961-0404
(203) 324-4704 (fax)
Attorney for Defendants

# APPENDIX A

## Plaintiff's Witness List

| NAME | ADDRESS | TESTIMONY SYNOPSIS |
|---|---|---|
| Howard Kerstine | 1485 Pine Tree Lane<br>Prescott, Arizona 86303 | Will testify concerning all aspects of his claims and as per his deposition. |
| Marilyn Kerstine | 1485 Pine Tree Lane<br>Prescott, Arizona 86303 | Will testify concerning Plaintiff's claims of promissory estoppel, as well as various aspects of damages including emotional distress. |
| Robert Deaton | C/O Defendants | Will testify concerning his job responsibilities before and after Plaintiff's termination and concerning Plaintiff's duties and qualifications compared with others. |
| Robert Stix | 118 Cuyama Road<br>Ojai, California 93023 | Will testify as per his declaration concerning industry standard practice in layoffs and practices used in Defendants' past layoffs in comparison with practices employed during Plaintiff's termination. |
| James Hurley | 6695 South A-1-A Highway<br>Melbourne Beach, Florida 32951 | Will testify as per his declaration concerning Plaintiff's extensive qualifications and experience. |
| Jerry Hemphill | 4545 North River Drive<br>Cumming, Georgia 30041 | Will testify as per his declaration and concerning Plaintiff's extensive qualifications and experience, as well as Defendants' bias against older employees. |
| Arthur Parks | 8228 Lakeridge Drive<br>West Chester, Ohio 45069 | Will testify as per his declaration concerning Plaintiff's extensive qualifications and experience, as well as Defendants' bias against older employees and his own experience. |
| Brent Ryman | 99 West Arroyo Street<br>Reno, Nevada 89505 | Will testify as per his declaration. |
| Company Representative | C/O Defendant | Will Identify and authenticate documents. |

APPENDIX D

Plaintiff's Exhibits

Exhibit 1    A list of names, positions and dates of birth of Easy Spirit sales staff at the time of the August 2001 RIF.

Exhibit 2    A list of proposed terminations prepared by Nine West Human Relations dated July 5, 2001.

Exhibit 3    A list of Easy Spirit employees as of August 1, 2001, which contained the word "eliminated" after the names of eleven employees with a line through the word "eliminated" after the names of Amy Castro, age 27, and Robert Deaton, age 39, who transferred to fill openings and Amy Nelson, age 26, who was listed as "transferred."

Exhibit 4    An email from Jackie Orris, Nine West Human Resource Director concerning discussions with Melissa Saraco about what jobs are open for transfer.

Exhibit 5    A form showing Suzanne Fonarow with starting date of August 13, 2001 as Director of Sales & Marketing for Enzo.

Exhibit 6    A copy of Defendant's Answer to Plaintiff's Interrogatory Number 6.

Exhibit 7    Defendants' memorandum of meeting to discuss August 2001 RIF.

Exhibit 8    Chart prepared by Plaintiff showing the Easy Spirit Sales organization as of August 20, 2001.

Exhibit 9    Letter of Defendants' Counsel Patricia Lind, dated September 14, 2001.

Exhibit 10   Authorization Form showing Suzanne Fonarow, age 44, starting as Director of Sales & Marketing for Enzo on August 13, 2001.

Exhibit 11   List of 24 Nine West employees slated for layoff in August 2001, including three who were subsequently transferred to fill openings and were not terminated: Bob Deaton, age 39; Amy Castro, age 27; and Abiba Kindo, age 22.

Exhibit 12   List of Nine West employees slated for layoff, listed by division.

Exhibit 13   Map prepared by Plaintiff showing Easy Spirit Regional Sales Directors ("RSDs") prior to August 7, 2001.

Exhibit 14   List of employees prepared by Defendants including those employees eligible to participate in August 2001 Nine West severance program and indicating those selected for layoff and those not selected for layoff.

Exhibit 15   Transcript of a phone conversation identified by Plaintiff as placed by company officials Orris and Schreck to Plaintiff on August 7, 2001.

Exhibit 16   Identification of three open positions with salary over $85,000 within Easy Spirit Division during the period of June 1, 2001 to January 1, 2002.

Exhibit 17    Identification of the Easy Spirit Sales force, employee salaries, territories, and sales volume.  Identifies the nine employees "eliminated" and three employees originally listed who were transferred to openings: Amy Nelson, age 25; Bob Deaton, age 39; and Amy Castro, age 27.

Exhibit 18    List of the Human Resource Representatives assigned to notify those let go.  Includes Aida Tejero-DeColli, HR Vice President for Jones Apparel, who was assigned to two Easy Spirit employees.

Exhibit 19    Nine West Associate Change Forms showing 14 Nine West employees transferred in July, August, September and October 2001.

Exhibit 20    Nine West Associate Change Forms showing transfer of 11 employees at various times in 2001 and 2002.

Exhibit 21    Termination Guide dated August 7, 2001 containing speech to be given to terminated employees.

Exhibit 22    List of those still working for Easy Spirit as of November 2002 and a listing of those who left during the period 1998 through 2002.

Exhibit 23    List of Nine West terminations during the years 2000 and 2002.

Exhibit 24    List showing sales numbers for Easy Spirit RSDs and Account Executives in 2000.

Exhibit 25    List of Easy Spirit staff as of July 2002 showing the RSD position has been abolished.  All RSDs are now called Sales Executives along with the other Account Executives.  It also shows Anne Morrissey and Helene Whitney as having filled Vice President positions since August 7, 2001.

Exhibit 26    List of 2000 Gross Shipments by Salesperson for Easy Spirit.

Exhibit 27    List of Account Coordinators including those laid off August 2001.

Exhibit 28    Organizational chart of Easy Spirit prepared sometime between May 1, 2001 and August 31, 2001.  Shows the RSD position vacated by Ward as "open" and the Director of Sales position as also "open."

Exhibit 29    Self-appraisal of Plaintiff for period February 1999 through December 1999.

Exhibit 30    1997 to 1998 Annual Performance Appraisal of Plaintiff indicating Plaintiff's performance against basic job accountabilities for 1996 in comparison to 1997.

Exhibit 31    Shipping report of Plaintiff for the first six months of 2001 indicating high performance.

Exhibit 32    March 3, 2001 Self-Appraisal form for Plaintiff.

Exhibit 33    Chart indicating Easy Spirit Job Descriptions.

Exhibit 34    Easy Spirit Team Responsibilities for accounts.

Exhibit 35    List of shipments for Plaintiff's & Deaton's Region as of July 21, 2001.

Exhibit 36     Plaintiff diary excerpt dated October 30, 1999.

Exhibit 37     Map prepared by Plaintiff showing sales staff prior to August 7, 2001.

Exhibit 38     Map prepared by Plaintiff showing sales staff prior to August 7, 2001 with additional handwritten corrections.

Exhibit 39     Chart prepared by Plaintiff showing sales force as of July 1, 2001.

Exhibit 40     Letter from Patricia Lind dated October 18, 2001.

Exhibit 41     List of Nine West employees terminated August 2001.

Exhibit 42     List of Order Entry employees.

Exhibit 43     Declaration of Howard Kerstine.

Exhibit 44     List of the Midwest Division for 1998 showing $22,578,589 in shipments to stores in Plaintiff's area, which he shared the responsibility for servicing.

Exhibit 45     Plaintiff's 1998 Annual Performance Appraisal.

Exhibit 46     Plaintiff's performance report for 1997, showing exceptional performance with department stores.

Exhibit 47     Letter of praise from Nine West's Manager Brenda Lauderback to Plaintiff concerning his work with the Belk Department Store chain.

Exhibit 48     Plaintiff's analysis of what happened to Easy Spirit personnel based on his personal knowledge and company records furnished.

Exhibit 49     Form showing the effective date of Kyri Fujiwara's promotion to the position of Regional Sales Director was August 13, 2001 around the time of Plaintiff's termination on August 7, 2001.

Exhibit 50     Portions of Plaintiff's diary.

Exhibit 51     Declaration of Jerry Hemphill.

Exhibit 52     Declaration of James Hurley.

Exhibit 53     Declaration of Arthur Parks.

Exhibit 54     Declaration of Robert Stix.

Exhibit 55     Letter of Grenier dated April 22, 2003 containing dates of birth of various employees.

APPENDIX F

PORTIONS OF DEPOSITIONS
TO BE OFFERED BY PLAINTIFF

| DEPONANT'S NAME | PAGE NUMBER(S) |
|---|---|
| Kerstine, Howard | 7-9, 11-12, 13-14, 17, 23, 30, 31, 32, 36, 44-46, 71-71-72, 78, 78-79, 80-81, 81, 86, 87, 89, 93-95, 107, 107, 107-109, 107-108, 108, 110, 113, 135, 136, 184, 192, 196 |
| Kerstine, Howard #2 | 35, 46 |
| Itzkowtiz, Susan | 8, 9, 12, 14, 17, 44, 44-45, 44-46, 45, 47, 49 |
| Ward, Geoffrey | 8-11, 10-11, 17, 24, 38, 38-39, 39-40, 41-42, 43, 45, 45-47, 50, 73, 83, 86, 94-95, 105 |
| Paterno, Rick | 12, 24, 26-27, 30, 31-33, 34-35, 35, 35-36, 36-37, 37, 42-43, 43-44, 45 |
| Schreck, Muriel "Mim" | 18-19, 26, 44, 104, 113-114, 114, 179-180, 185-186 |
| Orris, Jackie | 25, 26, 27, 28, 29, 29-30, 34, 44-45, 48, 48-50, 50, 57, 65, 65-66, 66, 92, 96 |