UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| HOWARD M. KERSTINE | : | |
| | : | CASE NO.  C-1-02-080 |
| Plaintiff | : | Judge Weber |
| | : | |
| vs. | : | |
| | : | **JOINT FINAL PRETRIAL** |
| NINE WEST GROUP, INC. | : | **ORDER** |
| JONES APPAREL GROUP | : | |
| | : | |
| Defendants | : | |

This matter is before the Court pursuant to Rule 16 of the Federal Rules of Civil Procedure.

I.    **APPEARANCES:**

**For Plaintiff:**

> Paul Tobias, Esq.
> David D. Kammer, Esq.
> Tobias, Kraus & Torchia
> 414 Walnut Street
> Suite 911
> Cincinnati, Ohio 45202
> (513) 241-8137
> (513) 241-7863 (fax)

**For Defendant:**

> Gary L. Greenberg, Esq.
> Denlinger, Rosenthal & Greenberg
> 2310 Firstar Tower
> 425 Walnut Street
> Cincinnati, Ohio 45202
> (513) 621-3440
> (513) 621-4449 (fax)

> Conrad S. Kee, Esq.
> Jackson Lewis LLP
> 177 Broad Street
> P.O. Box 251
> Stanford, Connecticut 06904
> (203) 961-0404
> (203) 324-4704 (fax)

II.    **NATURE OF ACTION AND JURISDICTION:**

A.    This is an action for damages caused by wrongful termination based on age discrimination in violation of the following federal and state anti-discrimination statutes: the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; state law claims under Ohio Revised Code § 4112.02(N) and § 4112.99; a common law public policy claim; and a breach of promise, causing detrimental reliance in violation of Ohio law governing promissory estoppel.

B.    The jurisdiction of the Court is invoked under Title 28 U.S.C. § 1331.  The Court's supplemental jurisdiction over Plaintiff's related state law claims is based on Title 28 U.S.C. § 1367.

C.    The jurisdiction of the Court is not disputed.

III.    **TRIAL INFORMATION:**

A.    The estimated length of trial is five to seven days.

B.    Trial to Jury will begin in December, 2003.

IV.    **STATEMENT OF THE CASE:**

A.    **Plaintiff's Statement of the Case**

Plaintiff Howard Kerstine, now age 60, has worked in the shoe industry for over 35 years.  He lived and worked in Cincinnati at the time of his termination.  He now works as a salesman for Mark Lemp Footwear, Inc., traveling throughout the Western United States.  He lives with his wife Marilyn in Prescott, Arizona.

Defendant Nine West Group, Inc. ("Nine West") is a corporation with headquarters in White Plains, New York.  Defendant Jones Apparel Co. ("Jones") owns Nine West and is its "parent" corporation.

In 1966 Kerstine was hired by U.S. Shoe Corporation ("U.S. Shoe"), where he worked continuously until 1987.  After leaving to work as an executive with two similar operations, Kerstine returned to U.S. Shoe in 1992 as Sales Manager for the Easy Spirit division.  In 1996 Kerstine was promoted to Vice President of Sales for Easy Spirit.  In 1995 Nine West purchased U.S. Shoe.  In 1999, Jones purchased Nine West.

Kerstine had a quadruple heart bypass operation in 1997, missing only three months of work.  When Plaintiff returned as VP of Sales, he resumed working harder than ever, putting in 12-hour days and 6-day weeks.  At that time, Kerstine lived in Cincinnati but commuted to Defendants' headquarters, which had recently moved to White Plains, New York.  Top management discussed having Kerstine to spend more time there, but considered the option of assigning him the lower Midwest Regional Sales Director ("RSD") position and replacing him as VP of Sales.

In 1998, Richard Paterno, then Easy Spirit's number two ranking agent as Executive Vice President of Sales, gave Kerstine three options: (1) he could continue as VP of Sales working in Cincinnati; (2) he could move to White Plains as VP of Sales; or (3) he could "take the region down in Ohio [as RSD] and . . . stay there and just do that as long as you want until he retired."  From that point on, Kerstine continued to discuss these options with Paterno, who relayed their conversations to Joe Dzialo, Easy

Spirit's President and highest-ranking employee. Kerstine gave considerable thought to this major life decision, and repeatedly asked Paterno to clarify what he meant, each time receiving the answer that Paterno intended for him to have lifetime job security until he retired if he took the lower RSD position. Paterno confirmed these conversations in his deposition.

Thus, due to business and personal considerations, and based upon multiple promises of job security from top management, Plaintiff took a step down from VP of Sales to RSD of the Midwest Region in 1998. The demotion involved less pay, less benefits, and loss of prestige.

In October 1999 Plaintiff received a job offer from another company. At that time, Plaintiff consulted with Paterno, who reaffirmed the 1998 promise, saying that Plaintiff indeed had a job for life until retirement. Based on this reaffirmation, Kerstine turned down the offer and remained with Defendants.

As would be expected, Plaintiff was an excellent RSD due to his personal talents and top management experience. Kerstine's record of performance is unparalleled and undisputed. While in his executive sales roles Kerstine performed exceptionally well, serving with distinction by all accounts. He was instrumental in implementing and promoting the use of computers in the industry and forged strong relationships with major department stores and independent retailers. His sales record was consistently outstanding. He was – by far – the most experienced of the eight Easy Spirit RSD's, being the only RSD with top management experience.

In June 2001 Jones ordered Nine West to streamline its operation and reduce costs in order to increase current profits. Despite his obvious experience, talents, and importance to the division, Kerstine was selected for termination during this Reduction in Force. He was selected because of his age. At age 59, Plaintiff was the eldest among the Easy Spirit RSDs and one of the oldest Nine West employees.

There is substantial evidence that Defendants were hostile toward older workers and treated younger workers more favorably.

Defendants allege that the layoff decision was based on a measurement that had never before been used to measure the importance of Easy Spirit sales personnel, the size of accounts within a region. The testimony of several witnesses and Defendants' own agents expose this explanation as unreasonable and pretextual. There were actually multiple decisions that needed to be made: (1) How should the regions be restructured? (2) Who would be assigned to the accounts? and (3) Who should be terminated? Discriminatory age bias infected each of these decisions.

In restructuring the region, Defendants consolidated Kerstine's territory with that of Charles Farris. Farris was then 41 – 18 years younger than Kerstine. Any comparison between the abilities of the two RSDs would have revealed the fact that Kerstine was obviously more qualified for the position. However, tellingly, there was no discussion of retaining Kerstine. Nor was there any review of the files to determine which employee should be retained. Instead, the decision was "automatic" – the older employee was terminated.

In assigning the accounts, Defendants chose to retain Kerstine's former subordinate: the then 39 year-old Robert Deaton, 20 years younger than Kerstine. Deaton took over Kerstine's accounts. There was absolutely no discussion of retaining Kerstine, who was vastly more qualified and experienced. Again, the decision was "automatic" – the older employee was terminated.

In deciding who should be terminated, the final results of the process reveal the true reason for the decision, which was to eliminate the older RSDs. Indeed, two of the oldest RSDs – Kerstine, age 59; and Richard Halperin, age 49 – were terminated as a result. Kerstine was the oldest of Easy Spirit's RSDs. Again, the decision was "automatic" – the older employee was terminated.

Additionally, Defendants discriminated against Kerstine by failing to transfer him – or to even consider him for a transfer – to another position. Defendants had a policy of considering candidates for layoff for other open positions. In fact Defendants admit that 14 younger Nine West employees were indeed transferred in lieu of layoff. Nelson, Deaton and Castro Easy Spirit employees were slated for layoff but were retained to fill openings. Defendants concede that Plaintiff was not even considered for any kind of transfer.

Kyri Fujiwara, age 32, obviously less qualified than Kerstine, was temporarily filling an opening as RSD on the West Coast. Kerstine was not even considered for the permanent opening. Defendants now say its policy did not permit relocation. Yet, Defendants admit the so-called policy was not iron clad and Fujiwara herself was permitted to relocate from California to Wisconsin.

At the time of Plaintiff's termination, there were at least six openings that could have been assigned to Plaintiff but were instead filled by employees substantially younger and clearly less qualified than Plaintiff. Yet the testimony of Defendants' own agents reveals that Defendants never once considered, discussed or even mentioned Plaintiff as a candidate for any of these positions. Predictably, the decision was "automatic" – the older employee was terminated.

Plaintiff was terminated as a direct result of his age in violation of the ADEA, parallel provisions in the Ohio Revised Code, O.R.C. §§ 4112.02(N) and 4112.99, the policy of the State of Ohio. Finally, Plaintiff claims a breach of promise, causing detrimental reliance in violation of Ohio law governing promissory estoppel.

Plaintiff has suffered substantial economic and emotional damages and is also entitled to liquidated and punitive damages and attorney fees.

B.    **Defendants' Statement of the Case**

Plaintiff was employed in Cincinnati, Ohio, by Defendant Nine West Group, Inc., as a Regional Sales Director in Nine West's Easy Spirit Division. On December 31, 2002, the party defendant Nine West Group Inc. assigned all assets and liabilities associated with its wholesale operations to Nine West Footwear Corporation. Nine West Group Inc. was, and Nine West Footwear Corporation is, a wholly owned subsidiary of Jones Apparel Group, Inc. sued herein as "Jones Apparel Group."

In August 2001, Nine West decided that it was necessary, for economic reasons, to restructure the Easy Spirit sales organization. This decision ultimately resulted in the elimination of 21 positions within the division, including 11 sales positions. Those affected included people over and under the age of 40. The restructuring included a decision that the division could effectively function with six, rather than eight, Regional Sales Directors and that the positions of the two Regional Sales Directors supervising the territories with the lowest sales volume should be eliminated. Plaintiff's territory had the lowest sales of the eight regions. Consequently, his position was eliminated and his employment was terminated on August 7, 2001. Plaintiff's age was not a factor in this employment decision.

Plaintiff rejected a generous severance package which Nine West offered to him in recognition of his years of service. Instead, Plaintiff elected to file this lawsuit asserting that he was terminated because of age discrimination and that his former supervisor had promised that it was his intention for Plaintiff to stay in Cincinnati as a Regional Sales Director until Plaintiff retired.

Defendants deny Plaintiff's allegations. The decision to include Plaintiff in the reduction in force was based exclusively on the fact that his territory had the lowest sales volume . Defendants also deny Plaintiff was ever promised employment until he retired. Rick Paterno had no authority, actual or apparent, to make any verbal promises regarding Plaintiff's employment. Pursuant to the defendants' stated policies, no one is authorized to provide any employee with an employment contract or special arrangement concerning terms and conditions of employment, unless the contract or arrangement is in writing and signed on behalf of the company by a corporate executive office. Plaintiff was aware of this policy and practice. Plaintiff had no written employment agreement.

Therefore, Defendants argue that Plaintiff has no viable claim because Defendants acted in good faith and for lawful, legitimate, nondiscriminatory reasons. Further, Defendants would have made the same decision regardless of Plaintiff's age. In addition, to the extent Plaintiff has suffered any loss, it is because he has failed to make reasonable efforts to find comparable employment. Defendants further argue that Defendant Jones Apparel Group, Inc. is not a properly named defendant and should be removed from the case.

V.    <u>TRIAL DETERMINATIONS:</u>

A.    <u>FACTS</u>

1.    <u>Stipulated Facts:</u>

The parties stipulate as to the following facts.

1.    Plaintiff Howard Kerstine has worked in the shoe industry for over 35 years.

2.    Kerstine lived and worked in Cincinnati, Ohio, at the time of his termination.

3.    Kerstine currently works for Mark Lemp Footwear, Inc., as a shoe salesman traveling the Western States.

4.    Kerstine lives with his wife Marilyn in Prescott, Arizona.

5.    Defendant Nine West Footwear Corporation, as successor-in-interest to Nine West Group Inc. ("Nine West") sells women's footwear, accessories and jewelry.

6.    The wholesale operations of Nine West are divided by brand among several divisions. It employs 600 to 700 employees. Nine West retail business is operated by an affiliated company through over 700 locations.

7.    Nine West's headquarters are in White Plains, New York.

8.    Defendant Jones Apparel Group, Inc., sued herein as "Jones Apparel Group"("Jones") designs and markets a broad array of branded apparel, footwear and accessories through retail and wholesale channels. Its headquarters are in Bristol, Pennsylvania.

9.    Jackie Nemerov was the President of Jones in the summer of 2001.

10.    Aida Tejero-DeColli was the Senior Vice President of Human Resource for Jones in the summer of 2001.

11.    Susan Itzkowitz was the President of Nine West in the summer of 2001.

12.    Muriel "Mim" Schreck (age 51) was the President of Nine West's Easy Spirit Division in the summer of 2001.

13.    Jacqueline "Jackie" Orris was the HR Director for Nine West in the summer of 2001.

14.    Geoffrey Ward (age 34) was an Easy Spirit RSD with responsibility for the West Coast prior to May 2001.  In May 2001 Ward was promoted to VP of Sales for Easy Spirit and relocated to White Plains, New York.

15.    Robert "Bob" Deaton (Age 39) was an Account Executive under Plaintiff in the Midwest region prior to August 2001.

16.    Amy Castro (age 27) was a Salesperson slated for layoff in August 201.

17.    Plaintiff was hired by U.S. Shoe Corporation ("U.S. Shoe") in 1966.

18.    Kerstine rose through the ranks to become National Sales Manager for Red Cross Shoe Division of U.S. Shoe with responsibility for 42 to 47 sales employees.

19.    After leaving in 1997 to take executive sales positions with Wohl Branded Sales, and Craddock-Terry, Inc. Shoe Co., Kerstine returned to U.S. Shoe in 1992.  At that time, Kerstine was 50 years of age.

20.    Nine West acquired the Easy Spirit brand from U.S. Shoe in approximately 1995.

21.    Plaintiff became an employee of Nine West when it acquired the Easy Spirit division from U.S. Shoe.

22.    Nine West was subsequently acquired by Jones in June 1999.

23.    Kerstine served as Sales Manager for the Easy Spirit Division of U.S. Shoe.

24.    In 1996, Kerstine was promoted to Vice President of Sales for Easy Spirit.  At that time, he was 54 years of age.

25.    As Vice President, Plaintiff reported directly to the Executive Vice President of Sales, Rick Paterno.

26.    The President of Easy Spirit at that time was Joe Dzialo.

27.    Both Mr. Dzialo and Mr. Paterno had written employment agreements with Nine West.

28.    In 1995, when Nine West acquired the Easy Spirit brand of U.S. Shoe, Mr. Dzialo and Mr. Paterno relocated to White Plains, New York, where Nine West was headquartered.

29.    Kerstine stayed in Cincinnati and traveled frequently to White Plains.

30.    In 1997 Kerstine had a quadruple heart bypass operation.  He missed three months of work.

31.    In or about July 1999, Easy Spirit implemented a significant reduction in force and as a result, several long term employees were terminated.

32.    Kerstine's employment status was not affected by the July 1999 reduction in force.

33.    In July 1999, Plaintiff turned 57 years of age.

34.    In the fall of 1999, an account executive who had been previously working in the Midwest region was transferred to another region, and as a result, Plaintiff had only one account executive with whom he covered his sales region.

35.    Mr. Paterno reassigned the Proffitts group of department stores out of Plaintiff's region to another RSD who was working out of Atlanta.

36.    After this reassignment, Plaintiff's sales region  included , Elder-Beerman department stores, the Shoe Corporation of America, which leased space in various department stores and several independent store accounts.

37.    In or about October 1999, Plaintiff claims that he had a conversation with his supervisor, Rick Paterno, who stated "[I]t was his intention to allow me to continue in this capacity, here in Cincinnati, until I decided to retire.  He said that he fully intended to protect me and my position here."

38.    Plaintiff had discussions with a company known as Softwalk regarding an alternative position.  Plaintiff was unable to reach an agreement for that job.

39.    In May 2001, Mim Schreck became the President of the Easy Spirit division, replacing Paterno, who had become President sometime before 2001.

40.    At that time, Schreck was 51 years of age.

41.    By 2001, Plaintiff was fully recovered from his heart surgery, was able to do a hundred pushups every day and fifty sit-ups every day, as well as swim and run. He is in pretty extraordinary shape for a man sixty years of age.

42.    In June 2001 Jones Apparel requested that Nine West streamline its operation and reduce costs.  The intent was to maximize profits.

43.    Schreck, President of Easy Spirit, made the final decision as to who would be terminated within her division.

44.    At that time, the Easy Spirit field sales organization consisted of three main positions: marketing associates, account executives and Regional Sales Directors.

45.    In June or July of 2001, within the field sales organization, there were eight RSD positions, seven account executive positions, and approximately 15 marketing associate positions.  In addition, there was one position known as the Special Wholesale Manager that was responsible for selling to the Army Air Force Exchange Service in Dallas and the Navy and Marine Corps Exchanges in Virginia.

46.    Schreck did not review the personnel files or performance evaluations of the individuals affected.

47.    Of the 11 Easy Spirit sales employees over age 40, four were terminated, including Plaintiff.

48.    As a result of the elimination of Plaintiff's position, responsibility for his single department store account, Elder-Beerman, was transferred to Deaton.

49.    Plaintiff's responsibilities for supervising Deaton were assumed by another RSD, Charles Farris.

50.    Deaton and Farris kept their existing duties and assumed Plaintiff's duties. Deaton also began performing most of the duties previously performed by another account executive who had recently resigned, Anne Hoskins.

51.    Before Schreck became President of Easy Spirit, the division gave credit to RSDs for all shoes shipped to their region, regardless of who made the sale.

52.    Schreck received no criteria or guidance as to how to achieve the stated goal of reducing costs and streamlining operations.

53.    The following are the ages (at the time of the RIF) of the employees whose employment was selected for termination , as provided by Counsel for Defendants: Abiba Kindo, 24; Melanie Saraco, 29; Angela DeJulio 39; Amy Nelson, 28; Carmine Gencarelli, 36; Mark Hoffman, 27; Ann Marie Logan 34; Karl Scherer, 51; Alanna Monroe, 28; Ray Doane, 51; Emerson Becker, 33; Fiona Doohan, 30; Meredith Sullivan, 26; Nicole Kornfeld, 31; Jeffrey Pearce, 38; Anne Morrisey, 41.

54.    The following employees are examples of employees throughout Nine West who were transferred in lieu of layoff. Amy Nelson (age 28) of Easy Spirit moved to Bandolino. Mark Hoffman moved to Nine West brand. Melanie Saraco, age 29, went from Jervin to Specialty Marketing in August 2001. Abida Kindo, age 24, was transferred from Specialty Marketing to Enzo on August 8, 2001. Angela DeJulio, age 39, went from Jervin to Corporate Sourcing on August 8, 2001. Carmine Gencarelli, age 36, was transferred from the MIS Department in White Plains, New York to Jones Apparel Headquarters in Bristol, Pennsylvania.

55.    There were 12 Easy Spirit Sales employees slated for layoff on July 5, 2001. These included Deaton, Castro and Nelson, all under age 40, who were selected to fill openings.


2.    <u>Disputed Facts:</u>

The parties dispute the following facts.

a.    Plaintiff [facts that Plaintiff says are true but are disputed by Defendant]:

56.    Richard "Rick" Paterno is the former President and Executive VP of Easy Spirit. During his tenure he made an agreement and promise that Plaintiff would have a job until retirement.

57.    There were eight Easy Spirit Regional Sales Directors ("RSDs") in July 2001: Howard Kerstine (age 59); Richard Halperin (age 49); Bob Terbrock (age 55); Jerry Hemphill (age 54); Janine Riley (age 50); Charles Farris (age 41); Kyri Fujiwara (age 32) and Steven Falk (age 37).

58.    Kyri Fujiwara (age 32) was an Account Executive under Ward on the West Coast. Fujiwara took over responsibility for the West Coast after Ward's promotion. At that time Fujiwara had less than five years of experience.

59.    Fujiwara temporarily filled the West Coast RSD position in early June 2001 and was officially promoted on August 13, 2001, around the time Plaintiff was terminated. Kerstine was more qualified for this position but was not considered.

60.    Suzanne Fonarow (age 44) filled an open position as Director of Sales & Marketing for Enzo, a division of Nine West, on August 13, 2001, around the time when Kerstine was terminated. Kerstine was qualified for this position, but was not considered by Defendants.

61.    Arthur Parks (age 54) is a Salesperson who was terminated around the time of Plaintiff's termination. Parks, like Kerstine, was also a victim of age bias.

62.    Richard Wall (age 53) is a Salesperson who was demoted in May 2001 and terminated in October 2002. Wall, like Kerstine, was also a victim of age bias.

63.    Plaintiff was living in Cincinnati, Easy Spirit's headquarters. After Easy Spirit's 1996 move to White Plains Kerstine commuted to White Plains a few days a week, and traveled the rest of the country in the remaining time. Nine West wanted him to spend more time in White Plains, but also was considering the option of assigning him the Midwest RSD position and replacing him as VP of Sales.

64.    In 1998 Rick Paterno, then the Executive Vice President of Sales for Easy Spirit, discussed Plaintiff's future with him, giving him three options: he could (1) maintain the status quo as VP of Sales commuting from Cincinnati; (2) move to White Plains as VP of Sales; or (3) stay in Cincinnati and become the RSD for the Midwest region, where he could stay as long as he wanted until he retired.

65.    Kerstine accepted Paterno's offer to step down to the RSD position based partially on the job security provided by the offer.

66.    Joe Dzialo, then the Easy Spirit Division President, was aware of the promise and confirmed the offer to Plaintiff.

67.    Kerstine's salary was reduced when he stepped down to RSD. His car allowance was also reduced. He also accepted a lower bonus potential and lower deferred compensation. He also gave up the prestige of VP status, which was very important to him.

68.    Paterno told Plaintiff that if he took the RSD position he could work as long as he wanted until he decided to retire.

69.    Kerstine advised Paterno and Dzialo of his decision to accept the demotion on July 30, 1998.

70.    Plaintiff accepted the RSD position based partially on the Company's promise of employment until retirement.

71. Plaintiff received a job offer from Old Main Trotter's and Daniel Green Footwear, a company interested in launching a new division called "Soft Walk." The formulation for this offer occurred in late 1999 and early 2000.

72. President Paterno reaffirmed his promise of lifetime employment on October 30, 1999, during the period in which Plaintiff was contemplating taking a possible position with Soft Walk.

73. In or about October 1999, Kerstine had a conversation with his supervisor, Paterno, who stated "[I]t was his intention to allow me to continue in this capacity, here in Cincinnati, until I decided to retire. He said that he fully intended to protect me and my position here."

74. Kerstine turned down the "Soft Walk" offer because there was none of the job security he had as a result of the promise of employment with Nine West until he retired.

75. Plaintiff's performance for the Company was outstanding. His sales record was consistently the best among his peers.

76. During the period in which Plaintiff served as an RSD his record of sales continued to be excellent. His accounts averaged an increase of 22% per year, higher than the other RSDs' increases.

77. For the year 1997 Plaintiff's sales also increased: Elder Beerman was up 92%; Proffits Stores were up 34.5%; and Belk was up 15%.

78. For the first six months of 2001, from January 1 through June 30, 2001, Plaintiff's record of shipments was up 20% from the previous year, the highest percentage increase in the Division. Bookings, or sales, on his first spring trip in 2001 were up 66%.

79. At the Las Vegas Shoe Show in late July and early August 2001, Plaintiff sold more shoes than any other of the sales personnel of Easy Spirit present at the show.

80. There were approximately 31 sales personnel in the Easy Spirit Division.

81. The decision as to which Account Executives and Marketing Associates should be terminated was based on a number of factors including performance, often keeping the strongest and eliminating the weakest. However, the decision as to which RSDs would be terminated was handled differently and tainted by age discrimination.

82. Easy Spirit President Paterno had previously informed Plaintiff that Nine West had an unfriendly attitude toward older employees.

83. Plaintiff could have handled the new territory consisting of his territory and Farris' territory. Plaintiff could have handled the Dillard's accounts, assigned to Falk. Plaintiff was more experienced and qualified than either Farris or Falk.

84. Defendants have a policy and practice of considering transfer in lieu of lay off.

85.    Nine West followed that policy for younger employees concerning the August 2001 RIF – but not for Plaintiff.

86.    Amy Castro, age 27, was also on the July 5, 2001 termination list. Castro was an Account Executive who lived in Chicago, also within Falk's region. At that time, Falk, age 37, was designated as the Key Account Executive for Dillards, which left an opening in the Midwest Region. Castro was taken off the termination list and promoted to become an Account Executive with responsibility for the many independent stores in the Midwest, a position for which Plaintiff was extremely well qualified. Plaintiff was never considered for this position.

87.    In July 2001 there was an opening for the Director of Sales for Enzo, another Nine West wholesale footwear division. On August 13, 2001 Suzanne Fonarow, age 44, and substantially younger than Plaintiff, was moved into that position. Plaintiff could have done the job. Plaintiff was never considered for this position.

88.    Soon after Kerstine's termination, Defendants filled the position of Director of Sales for Easy Spirit by hiring Anne Morrissey, about age 40, also substantially younger than Plaintiff. Kerstine had previously preformed a similar position and could have performed this job. Plaintiff was never considered for this position.

89.    Defendants had no iron-clad policy prohibiting employee relocation. Ward was relocated from the West Coast to White Plains at Defendants' expense in May 2001. Fujiwara relocated from California to Minnesota sometime in 2002.

90.    Upon his termination, Kerstine specifically asked VP of Sales Glen Ross to be considered for other positions. His request was denied.

91.    Kerstine would have considered a lower rated job, even if it involved relocation at his own expense.


        b.    Defendant [facts that Defendant says are true but are disputed by Plaintiff]:

1.    Plaintiff was employed by Nine West and not Jones Apparel.

2.    The individuals involved in the decision to terminate Plaintiff's employment were all employed by Nine West.

3.    The U.S. Shoe employment application signed by Kerstine when he returned in 1992 contained the following disclaimer: "Should I accept employment with The Company I acknowledge that no contract of employment exists, implied or otherwise. The policies, benefits, and other programs listed in the employee booklets are provided either in compliance with applicable statutes or at the discretion of the Company. This does not imply a contract of employment. The policies, benefits, and other programs offered by the Company may be changed or eliminated at the Company's discretion." Kerstine knowingly signed the affirmation that there was no such employment contract.

4.    Plaintiff subsequently received a Nine West employee handbook that provided: "I acknowledge that this handbook is not a contract; that I do not have any contractual right

to employment or to the maters set forth in this handbook.  My employment is "at will" and both the company and I have the right to end the employment relationship at any time, with or without cause or notice.  This "at will" relationship can only be modified by a written agreement signed by both the President of Nine West Group, Inc. and myself."

5.      Plaintiff was never offered, nor did he ever sign, an employment agreement with U.S. Shoe Corporation, Nine West, or Jones Apparel.  Plaintiff knew that Mr. Paterno and others had written employment agreements.

6.      Plaintiff was aware, from personal experience that sales employees everywhere are often discharged without warning when their supervisors leave the company.

7.      Plaintiff had no documentation regarding his employment status other than the U.S. Shoe Corporation employment application in which he acknowledged he was an employee-at-will.

8.      In mid-1998, at Plaintiff's request, Plaintiff relinquished the Vice President of Sales position and took and elected to take a Regional Sales Director ("RSD") position overseeing a sales region that included Cincinnati.

9.      During the ten years preceding the termination of Plaintiff's employment, Easy Spirit's sales force had been reduced by half, from fifty sales people to twenty-five.

10.     This reduction in force was due to the need to reduce costs.

11.     The reassignment of the Profitts account to a RSD other than Plaintiff made sense geographically since Proffitts was headquartered out of Knoxville, Tennessee, thereby making it easier to service from Atlanta than it was from Cincinnati.

12.     Well before the RIF that led to the termination of Plaintiff's employment, Nine West had begun to concentrate the bulk of its sales efforts on the major department stores.

13.     Plaintiff claims that he never wanted a written agreement because Paterno's and other employees agreements contained non-competition provisions.

14.     Plaintiff also concedes that he did not request anything in writing to confirm his understanding regarding job security and did not tell anyone at Nine West about his discussion with Mr. Paterno until after his employment had been terminated.

15.     Plaintiff and Ms. Schreck were acquainted before Ms. Schreck became president of Easy Spirit, but they had little personal knowledge about each other.

16.     Ms. Schreck had no knowledge of Plaintiff's prior health issues until after Plaintiff's employment had ended.

17.     Ms. Schreck's understanding of why Plaintiff opted to step down as Vice President of Sales and take the RSD position was that he had chosen to  remain in Cincinnati for personal reasons.

18.     During the transition from Mr. Paterno's presidency to Ms. Schreck's, Ms. Schreck and Mr. Paterno did not discuss Easy Spirit's RSDs or sales regions, or any specifics relative to the business situation in each region.

19.     In or around October 1999, Plaintiff wrote a note to his personal journal noting that he believed that his job could be easily eliminated because he had no major department stores within his region and because the company was focusing its business on marketing to department stores.

20.     Approximately one year before Plaintiff's employment ended, the Shoe Corporation of America went out of business, thereby leaving Plaintiff with one major account in his territory.

21.     Plaintiff was concerned about his job security after the loss of the Shoe Corporation of America account.

22.     Generally, the shoe industry changed during Plaintiff's employment with Nine West such that many independent shoe retailers were going out of business, while the major department stores were consolidating.

23.     This was based, in part, on its business judgment that selling to department stores was more profitable, and required less manpower, than selling to the remaining independent retailers. Nine West's "philosophy of business" was that it was more efficient to sell to the purchasing departments of major, high volume department stores, than to invest the time and manpower needed to effectively call on the numerous and scattered remaining independent retailers.

24.     Plaintiff was aware of Nine West's "philosophy of business" regarding its focus on department stores.

25.     Plaintiff was aware in early 2001 that Mr. Paterno was looking to leave Nine West. Plaintiff believed that Mr. Paterno's departure from Nine West negatively impacted his job security.

26.     As a result of learning that Mr. Paterno was looking to leave, Plaintiff wrote journal entries that stated: Paterno's decision to leave Nine West "is not good for me. How long have I got?  Don't know;" Paterno's interview for another job "could spell big trouble for me. I'd better talk to Demma about coming over and begin to look for another job pretty quick."

27.     Upon learning that his sole major account, Elder-Beerman, was on credit hold, Plaintiff wrote in his journal that "if they go, my job is in serious jeopardy.  God help [them] stay sound financially."

28.     Plaintiff was unable to reach an agreement for a position with Softwalk because he wanted more money than Softwalk was willing to pay and because Softwalk was unwilling to enter into a three year written employment agreement.

29.  In or about the Spring of 2001, Plaintiff learned that the Easy Spirit division was changing the method that it used to give credit for sales to RSD and that it would give sales credit to RSD's based on the sales to accounts under their supervision and not based on the shoes shipped into their region.

30.  Ms. Schreck had no information on the volume of sales for each RSD using the method formerly used in Easy Spirit, but even if she had such information, she would not have given much, if any, weight to it since she intended the RSDs to be primarily responsible for managing their assigned accounts.

31.  In or about June 2001, Ms. Schreck attended a meeting with the presidents of the various Nine West and Jones Apparel divisions, wherein each president was charged with examining where there could be cost savings in his or her division, and formulating recommendations that made good business sense.

32.  Ms. Schreck and Easy Spirit's Senior Vice President and Vice President of Sales, examined and analyzed the various Easy Spirit regions to determine what structure would enable the division to best service its accounts throughout the country.

33.  After reviewing the field sales organization, Ms. Schreck concluded Easy Spirit could effectively operate with six RSD positions rather than eight. Ms. Schreck further determined Easy Spirit could eliminate the marketing associate function, eliminate one account executive position and eliminate the Special Wholesale Manager position.

34.  The focus in the reduction was the elimination of positions, not of specific people.

35.  Ms. Schreck considered all of the Regional Sales Directors to be acceptable performers and therefore did not use performance as a factor in deciding which Regional Sales Directors to retain.

36.  RSD positions were being eliminated on the basis of the relevant sales numbers for each Regional Sales Director.

37.  Plaintiff's sales region was one of the two smallest regions in terms of sales volume and consisted of only one major account.

38.  The sales volume figures for the eight RSDs were, in descending order: Jerry Hemphill, $43.7 million; Bob Terbrock, $37.7 million; Janine Riley, $21.8 million; Steven Falk $20.3 million; Geoff Ward $16.5 million; Charles, Farris $15.5 million; Rich Halperin, $8.5 million; Howard Kerstine, $ 4.7 million.

39.  Further, Ms. Schreck did not know, nor did she consider, the ages of those affected by the reduction in force.

40.  Based upon sales volumes, the RSD positions held by Mr. Halperin and Plaintiff were eliminated and the accounts under their supervision were reassigned among the remaining regions.

41.  Nine West did not consider Plaintiff's age in deciding to eliminate his position and Plaintiff was not singled out for discharge for impermissible reasons.

42.  Plaintiff was discharged as part of a RIF when his position was eliminated and his work was redistributed.

43.  At the time Ms. Schreck became President of Easy Spirit, there were approximately 57 positions in the Easy Spirit organization.  As a result of the reorganization, the company eliminated approximately 21 of these positions, including 11 sales positions.

44.  For economic reasons, Nine West ceased relocating employees effective May 2001.

45.  Some of the employees whose positions were eliminated were offered transfer to vacant positions.  None of these transfers required relocation.

46.  There were no positions that Plaintiff could have transferred to that would not have involved his relocation from Cincinnati.


B.    **APPLICABLE PROPOSITIONS OF LAW:**

1.    **Plaintiff's Applicable Propositions of Law:**

Age Discrimination

The Plaintiff claims that the Defendants discriminated against him by terminating him because of his age.

The law makes it unlawful for an employer to discriminate against an employee who is over the age of 40 because of that employee's age.  This means that an employer may not select an employee for termination based, wholly or partially, on the basis of the employee's age.

Plaintiff has the burden of proving by a preponderance of the legal evidence that his age was a motivating factor in Defendants' decision to terminate him.  In an age discrimination lawsuit under federal law, Plaintiff can prove his case by showing the following by a preponderance of the legal evidence:

(1) That Plaintiff was over 40 years of age;

(2) That Plaintiff was terminated;

(3) That Plaintiff was qualified for the job he held; and

(4) That the termination of Plaintiff allowed Defendants to retain younger employees or Plaintiff was treated differently than similarly situated younger employees or Plaintiff was replaced by a substantially younger employee.

Plaintiff may establish his claims by direct or circumstantial evidence.

Plaintiff may establish his claim of age discrimination by circumstantial evidence if the circumstantial evidence is sufficient to prove by a preponderance of the legal evidence that his age was a motivating factor in the Defendants' decision to terminate him.

If Plaintiff establishes the foregoing, the Defendants must present some legitimate, non-discriminatory reason for the decision to terminate him. The trier of fact is not obligated to believe the reasons set forth by the Defendants to justify their decision. It may look at the legal evidence presented at trial and decide whether the reasons put forth are the true reasons, or if those reasons are false, unworthy of credence, or are themselves motivated by stereotypical assumptions about employees of Plaintiff's age or other indications of age discrimination.

An employer's business judgment is not an absolute defense to unlawful discrimination.

The reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation i.e. whether it was pretextual. You may consider whether the employer made a reasonably informed and considered decision before terminating Kerstine.

The reasonableness of a business decision is critical in determining whether the proffered judgment was the employer's actual motivation. For example, if a jury can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the jury can legitimately infer that the employer consciously selected a less-qualified candidate--something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture. Thus, a jury may conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness, and thus find it pretextual.

### Selection for Layoff

The Plaintiff claims that the Defendants discriminated against him by selecting him for layoff rather than other younger employees based on his age. In situations involving layoff, one way an employer violates the ADEA is when it treats younger employees more favorably than older employees in making layoff decisions based on age. The jury may consider evidence that the Defendants treated younger employees more favorably than they treated the Plaintiff in making their layoff decisions as evidence of age discrimination.

### Failure to Transfer

The Plaintiff claims that the Defendants had a policy of considering employees in lieu of layoff and transferred younger employees during the lay off period, but that the Defendants did not consider Plaintiff for transfer because of his age. An employer violates the ADEA when it transfers other displaced employees but does not place a plaintiff in an open position because of age discrimination. If the jury decides that the Defendants did not consider Plaintiff for job openings and transferred younger workers to open positions while denying Plaintiff the same opportunity, this may be considered as evidence of age bias. The jury may also consider the hiring of younger employees for open positions, rather than transfer of Plaintiff, as evidence of age discrimination.

### Determining Factor

The Plaintiff need not show that his age was the sole or exclusive factor in Defendants' decision to terminate him. There may have been more than one factor that motivated the defendant. In order to prove

age discrimination, Plaintiff must prove by a preponderance of the legal evidence that one such factor was his age and that age made a difference in the determination of whether he was to be selected for termination.

### Circumstantial Evidence

In addition, the Plaintiff is not required to produce direct evidence of unlawful motive. Intentional discrimination, if it exists, is seldom admitted, but is a fact that may be inferred from the existence of other legal evidence. The Plaintiff must only prove by the greater weight of the evidence that age was a determining factor for his termination.

### Direct Evidence

If the jury finds that the Plaintiff has proven by the greater weight of direct evidence that he was terminated on the basis of age, then Plaintiff prevails, unless the Defendants prove by the greater weight of the evidence that the Plaintiff would have been terminated independent of his age. In doing so, the jury should consider all the facts and circumstances in evidence.

### Stereotypes

Another way Plaintiff can establish employment discrimination based on age is to prove by a preponderance of the legal evidence that Defendants based their decision on stereotypical, untrue views of the Plaintiff.

### Multiple Decision Makers

The fact that some of the persons who participated in the decision-making process regarding the Plaintiff's termination did not make the "final" decision to terminate him does not insulate the Defendants from a finding of discrimination. So long as a person anywhere in the chain of events leading to the decision acting within the scope of his or her employment was influenced or motivated by the Plaintiff's age in giving his or her input, the trier of fact may determine the ultimate decision was discriminatory.

### Damages – Back Pay

If Plaintiff prevails, he is entitled to recover lost wages and benefits, including any increases in wages or benefits lost because of discrimination. The amount of wages and benefits due is determined by calculating the amount that would have been earned from the date of the termination to the date of the verdict. Plaintiff should recover all forms of compensation that the Plaintiff proved he would have earned, but for his termination, including salary, bonuses, vacation pay, pension, health insurance and other benefits. In determining the amount of back pay, there should be deducted the amount of wages and benefits received from replacement income during the period of back pay awarded.

### Front Pay

If the jury finds for the Plaintiff, the jury shall consider an award of front pay. Front pay includes the amount the Plaintiff would have earned from the date of the verdict until of find the Plaintiff's loss of future pay and benefits will cease. Among the factors to be considered in deciding the amount of front pay are the following: (1) the age of the Plaintiff; (2) salary and other tangible benefits, such as bonuses and vacation pay; and (3) the replacement value of fringe benefits. In determining the amount of front pay, there should be deducted the amount of wages and benefits that will be received from replacement income during the period of front pay awarded.

### Compensatory Damages – General

If Plaintiff obtains a verdict, he should be awarded an amount of money that will reasonably compensate the Plaintiff for the actual injury proximately caused by the conduct of the Defendants.

### Compensatory Damages – Emotional Suffering

In deciding this amount the jury may consider the nature, character, seriousness and duration of any emotional pain, suffering, anxiety, inconvenience, metal anguish, and loss of enjoyment of life the Plaintiff may have experienced.

### Compensatory Damages – Future or Permanent Injury and Expense

The Plaintiff also claims that he will experience emotional pain in the future. The jury may return a verdict for any future injury or damages by the greater weight of the evidence that the injury or damages are reasonably certain to occur and were the proximate result of the Defendants' conduct.

### Liquidated Damages – Willful Violation

If the jury determines that the Plaintiff has met his burden of proving that age was a motivating factor in the decision to terminate him, then you will proceed to make an additional determination of whether the Defendants acted willfully.

Plaintiff bears the entire burden of proving by a preponderance of the legal evidence that Defendants acted willfully.

In order to establish that Defendants acted willfully, the Plaintiff must prove by a preponderance of the legal evidence that the Defendants knew or showed reckless disregard for whether their conduct was forbidden by the law.

In determining whether the Defendants acted willfully, the jury may consider omissions, and all of the facts and circumstances.

### Punitive Damages

If the jury finds by clear and convincing legal evidence that the Defendants intentionally discriminated against Plaintiff, the law allows the jury to award punitive damages.

The purpose of an award of punitive damages is, first, to punish a wrongdoer for misconduct and, second, to warn others against doing the same.

In this case the jury may award punitive damages if it finds by clear and convincing legal evidence that the Defendants engaged in an unlawful discriminatory practice with actual malice or callous indifference to the rights of Plaintiff to be free from intentional discrimination.

Callous indifference means "conscious" or "deliberate" indifference to the protected rights of the Plaintiff or disregard of a high degree of danger to the Plaintiff's rights about which the Defendants know or which would be apparent to a reasonable person.

"Actual malice" is defined as either (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights of other persons that has a great possibility of causing substantial harm.

If the jury determines by the legal evidence received in the case that Defendants' conduct justifies an award of punitive damages, it may award an amount of punitive damages that all jurors agree is proper.

The amount that the jury determines must be reasonable.  Sympathy for or dislike of any party in the case must not guide the jury.

### Promissory Estoppel

The Plaintiff claims that the Defendants made a promise that he would have a job until he wanted to retire upon which he relied, and Defendants should be bound by that promise.  The jury can find for the Plaintiff if the jury finds by the greater weight of the evidence that:

1)      The Defendants promised that he would have a job until he wanted to retire;

2)      The Defendants knew or should have known that the Plaintiff would act in reliance on that promise;

3)      The Plaintiff did act in one of two ways:

   a)      By accepting the lower-paying, lower-rated job as Regional Sales Director and staying in Ohio; and/or

   b)      Declining or failing to fully investigate other employment possibilities in reasonable reliance on the Defendants' promise;

4)      The Plaintiff's act was detrimental to him; and

5)      Injustice will result if the Defendants' promise is not enforced.

On the other hand, the jury will find for the Defendants if the Plaintiff failed to prove any of the foregoing facts by the greater weight of the evidence, or if the jury determines that the evidence is evenly balanced.

### Expectation Damages

If the jury finds by the greater weight of the evidence that the Defendants broke the promise of employment until retirement, the Plaintiff is entitled to damages in the amount sufficient to place him in the same position in which he would have been if the promise had been fully performed by the Defendants to the extent that the damages are reasonably certain and reasonably foreseeable.

### Damages – Lost Wages

Lost wages are calculated by deciding what the Plaintiff was entitled to receive had the promise been performed.  The jury should then add other damages, if any, suffered by the Plaintiff as a result of the broken promise by the Defendants.

If Plaintiff shows that Defendant acted intentionally, the jury may award double  damages and lost benefits and lost benefits twice the amount of back pay and front pay.

2.      <u>Defendants' Applicable Propositions of Law:</u>

(a)      **Regarding Whether Jones Apparel is a Properly Named Defendant:**

For an entity to be a "single employer or "integrated enterprise," the Sixth Circuit examines four factors:  (1) interrelation of operations (i.e., common offices, common record keeping, shared equipment and finances); (2) common management; (3) centralized control of personnel and labor relations; and (4) common ownership and financial control.  <u>Swallows v. Barnes & Noble Book Stores, Inc.</u>, 128 F.3d 990, 993-94 (6th Cir. 1997) (noting analysis applies to claims under both ADEA and ADA).

(b)    Regarding the Age Discrimination Claim

The same burden-shifting evidentiary framework applies to discrimination claims brought under the federal and state laws.  Allen v. Ethicon, Inc., 919 F.Supp. 1093, 1098 (S.D. Ohio 1996).  A plaintiff claiming age discrimination under these statutes may establish a prima facie case by introducing either direct or indirect evidence that the defendant discharged the plaintiff because of his age.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1081 (6th Cir. 1994).  Plaintiff may establish a prima facie case of age discrimination through circumstantial evidence by showing that: (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was qualified for the position lost or not gained; and (4) his position was filled by someone outside of the protected class..  Carpenter v. Western Credit Union, 62 F.3d 143, 144 (6th Cir. 1995); Manzer, 29 F.3d 1081 (citing McDonnell Douglas, 411 U.S. at 802; Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 313 (6th Cir. 1989)).

In situations involving reductions in force ("RIF"), the fourth element of the prima facie case is modified because the plaintiff is not necessarily "replaced" and the plaintiff must present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  Barnes v. GenCorp, 896 F.2d 1457, 1465 (6th Cir. 1990).  "This 'extra' evidence [in the case of RIFs] must be 'sufficiently probative' to permit the fact finder to believe the defendant intentionally discriminated against the worker based on age."  Marano v. Aircraft Braking Systems, Inc., 138 F.Supp.2d 940, 949 (N.D. Ohio 2001)(quoting Barnes).

An employer who reduces its work force for economic reasons is not required to transfer an employee whose position is eliminated or to displace workers with less seniority.  Barnes, supra; Simpson v. Midland-Ross Corp., 823 F.2d 937, 942 n.6 (6th Cir. 1987).  An employee denied the opportunity to transfer may establish a prima facie case of discrimination when he produces evidence, inter alia, that a similarly-situated who is not a member of the protected class was offered the opportunity to transfer to an available poisition.  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). A plaintiff seeking to make such a comparison, the plaintiff must prove that all relevant aspects of his employment situation were similar to those of the employee with whom he seeks to compare himself.  Id. To be similarly-situated a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances which would distinguish their conduct or the employer's treatment of them for that conduct.  Id.; Smith v. Leggett Wire Co., 220 F.3d 752, 762 (6th Cir. 2000).

If a plaintiff establishes a prima facie case, the employer can overcome the prima facie case by articulating a legitimate, nondiscriminatory reasons for having made the employment decision that affected the plaintiff.  McDonnell Douglas, 411 U.S. at 802.  If the defendant satisfies this burden of production, the plaintiff must prove by a preponderance of the legal evidence that the reasons offered by the employer were not its true reasons, but were a pretext for age discrimination.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); Barnes, 896 F.2d 1469.  In age discrimination cases, plaintiff has the ultimate burden of proving that age was a determining factor in the adverse employment decision.  Chappell v. GTE Products Corp., 803 F.2d 261, 265 (6th Cir. 1986).

(c)    Regarding Wrongful Discharge

In Ohio, the tort of wrongful discharge in violation of public policy requires the plaintiff satisfy four elements: (1) that a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law; (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy; (3) that the plaintiff's dismissal was motivated by conduct related to the public policy; and (4) the employer lacked overriding legitimate business justification for the dismissal. Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 375 (6th Cir. 1999). To succeed on a wrongful discharge theory based on discrimination statutes, Plaintiff must still establish that he is entitled to relief under those statutes. Id. at 378.

The same burden-shifting evidentiary framework applies to discrimination claims brought under the federal and state laws. Allen v. Ethicon, Inc., 919 F.Supp. 1093, 1098 (S.D. Ohio 1996). If a plaintiff is able to establish a prima facie case, the burden of production shifts to the defendant to show legitimate, nondiscriminatory reasons for having made the employment decision that affected the plaintiff. If the defendant satisfy this requirement, the plaintiff than has the burden of proving, by a preponderance of the evidence, that the reasons offered by the employer were not its true reasons, but were a pretext for age discrimination. Id.

A plaintiff may not obtain double recovery on his age discrimination claims under federal and state law.

(d)    Regarding Promissory Estoppel

To prove a claim for promissory estoppel in an employment setting, a plaintiff must show: (1) the employer made a promise clear and unambiguous in its terms; (2) which it reasonably should have expected to induce reasonable and foreseeable reliance by the plaintiff; (3) that there actually was such reasonable and foreseeable reliance; and (4) injustice can only be avoided by enforcement of the promise. Godfredson, 173 F.3d at 376.

In Ohio, promises of employment may support a promissory estoppel claim only if the promises are specific and the promises can be reasonably relied upon. Buren v. Karrington Health, No. 00AP-1414, 2002 Ohio App. LEXIS 124, at *8 (Ohio App. Jan. 17, 2002).

(e)    Regarding Back Pay Damages

If Plaintiff prevails, the jury may award, as actual damages, an amount that reasonably compensates Plaintiff for any lost wages and benefits, taking into consideration any increases in salary and benefits, including pension, he would have received had he not been discharged. The intent is to make the plaintiff whole, without providing a windfall. Therefore, a back pay award should be reduced by the amount of wages and benefits the plaintiff received from other sources during the period since his discharge. Lorillard v. Pons, 434 U.S. 575, 98 S. Ct. 866, 55 L. Ed. 2d 40 (1978).

If a plaintiff secures subsequent comparable employment, but then voluntarily resigns from that employment, the Court may reduce any available back pay award to exclude any damages owing from the time of the resignation forward. Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1273 (4th Cir. 1985).

(f)     Regarding Front Pay

Front pay is not automatically awarded to a prevailing plaintiff. Rather, the Court's preferred remedy is reinstatement. Gutzwiller v. Fenik, 860 F.2d 1317, 1333 (6th Cir. 1988). In some circumstances, reinstatement may not be a viable option; i.e., the level of hostility between the parties precludes it, it would require the displacement of an innocent third-party, or the plaintiff has found other comparable work. Henry v. Lennox Indus., 768 F.2d 746, 752-53 (6th Cir. 1985). In such circumstances, the Court may consider the propriety of a front pay award. Roush v. KFC National Mgmt Co., 10 F.3d 392, 397 (6th Cir. 1993). Such consideration is in the sound discretion of the District Court and front pay may not be appropriate in every case. Id. (citations omitted). A plaintiff's eligibility for front pay is a question of law for the Court. Only when the Court determines front pay is appropriate may it be presented to the jury to determine the amount. Id. at 398. In such cases, the award must be reduced by amounts earned at other employment, as well as other factors, such as the plaintiff's failure to mitigate his damages. Id. at 400.

(g)     Regarding Liquidated Damages

Under the ADEA, a plaintiff may be eligible for liquidated damages if the employer's violation of the Act is considered "willful." To find willfulness, a jury must conclude, by a preponderance of the evidence, that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited." Skalka v. Fernald Environmental Rest. Mgmt. Corp., 178 F.3d 414, 423 (6th Cir. 1999)(citation omitted). "It is not enough to show that the employer knew that the ADEA was 'in the picture' or that the employer 'acted without a reasonable basis for believing that it was complying with the statute.'" Id.

(h)     Regarding Expectation Damages

If the jury finds by a preponderance of the evidence that Defendants broke the promise of employment until retirement, the jury may award Plaintiff damages in an amount sufficient to place him in the same position in which he would have been if the promise had been fully performed by the Defendants, to the extent the damages are reasonably certain and reasonably foreseeable.

C.     WITNESSES:

The parties have listed on the appropriate appendices (**Plaintiff's Appendix A**; **Defendant's Appendix B** those persons who will be called or who will be available to testify.

The parties reserve the right to call without prior notice to opposing counsel rebuttal witnesses whose testimony could not reasonably be anticipated.

D.     EXPERT WITNESSES:

The parties do not anticipate calling upon any expert witnesses during trial.

E.    <u>EXHIBITS:</u>

The parties will offer as exhibits those items listed on appendices hereof as follows:

(1)    <u>Joint Exhibits: Appendix C</u>

(2)    <u>Plaintiff's Exhibits: Appendix D</u>

(3)    <u>Defendants' Exhibits: Appendix E</u>

F.    <u>DEPOSITIONS:</u>

Plaintiff will offer by deposition portions of the testimony of Susan Itzkowitz, Jackie Orris, Richard Paterno, Muriel "Mim" Schreck, and Geoff Ward including portions set forth in the Appendix to Plaintiff's response to Defendant's motion for Summary Judgment (see Appendix F) and the Parties' final designations will be furnished 15 days prior to trial.

Defendants may offer portions of the deposition testimony of Jackie Orris, Richard Paterno, Muriel "Mim" Schreck, Susan Itzkowitz, Geoffrey Ward, and Howard Kerstine, including portions attached to the Declarations of Jeffrey M. Vona and Christian A. Grenier, which were filed in support of Defendants' Motion for Summary Judgment (See Appendix G), as necessary to complete the record.  The Parties' final designations will be furnished 15 days prior to trial.

G.    <u>DISCOVERY:</u>

Discovery has been completed.

H.    <u>PENDING MOTIONS:</u>

Plaintiff has filed a Motion to Amend the Complaint.  Defendants have filed a Motion for Summary Judgment.  Both motions are pending at this time.

IV.    <u>SETTLEMENT EFFORTS:</u>

The parties have made a good faith effort to negotiate settlement, including but not limited to attending a mediation session conducted by Magistrate Judge Hogan, but have not reached an agreement at this time.

Respectfully submitted,

_____
Paul H. Tobias – 0032415
David D. Kammer – 0061808
Tobias, Kraus & Torchia
414 Walnut Street
Suite 911
Cincinnati, Ohio 45202
(513) 241-8137
(513) 241-7863 (fax)
Attorneys for Plaintiff

_____
Gary L. Greenberg – 0023180
Denlinger, Rosenthal & Greenberg
2310 Firstar Tower
425 Walnut Street
Cincinnati, Ohio 45202
(513) 621-3440
(513) 621-4449 (fax)
Attorney for Defendants

_____
Conrad S. Kee
Jackson Lewis LLP
177 Broad Street
P.O. Box 251
Stanford, Connecticut 06904
(203) 961-0404
(203) 324-4704 (fax)
Attorney for Defendants

IT IS SO ORDERED.


_____
Herman J. Weber, Senior Judge
United States District Court

APPENDIX A

Plaintiff's Witness List

| NAME | ADDRESS | TESTIMONY SYNOPSIS |
|---|---|---|
| Howard Kerstine | 1485 Pine Tree Lane<br>Prescott, Arizona 86303 | Will testify concerning all aspects of his claims and as per his deposition. |
| Marilyn Kerstine | 1485 Pine Tree Lane<br>Prescott, Arizona 86303 | Will testify concerning Plaintiff's claims of promissory estoppel, as well as various aspects of damages including emotional distress. |
| Robert Deaton | C/O Defendants | Will testify concerning his job responsibilities before and after Plaintiff's termination and concerning Plaintiff's duties and qualifications compared with others. |
| Robert Stix | 118 Cuyama Road<br>Ojai, California 93023 | Will testify as per his declaration concerning industry standard practice in layoffs and practices used in Defendants' past layoffs in comparison with practices employed during Plaintiff's termination. |
| James Hurley | 6695 South A-1-A Highway<br>Melbourne Beach, Florida 32951 | Will testify as per his declaration concerning Plaintiff's extensive qualifications and experience. |
| Jerry Hemphill | 4545 North River Drive<br>Cumming, Georgia 30041 | Will testify as per his declaration and concerning Plaintiff's extensive qualifications and experience, as well as Defendants' bias against older employees. |
| Arthur Parks | 8228 Lakeridge Drive<br>West Chester, Ohio 45069 | Will testify as per his declaration concerning Plaintiff's extensive qualifications and experience, as well as Defendants' bias against older employees and his own experience. |
| Brent Ryman | 99 West Arroyo Street<br>Reno, Nevada 89505 | Will testify as per his declaration. |
| Company Representative | C/O Defendant | Will Identify and authenticate documents. |

APPENDIX B

Defendants' Witness List

| 1. | Muriel Schreck | Will testify as to certain aspects the decision to reduce force and circumstances leading to the termination of Plaintiff's employment. |
| 2. | Susan Itzkowitz | Will testify as to certain aspects of the decision to reduce force and circumstances leading to the termination of Plaintiff's employment. |
| 3. | Jackie Orris | Will testify as to certain aspects the decision to reduce force and circumstances leading to the termination of Plaintiff's employment. |
| 4. | Geoffrey Ward | Will testify as to certain aspects the decision to reduce force and circumstances leading to the termination of Plaintiff's employment. |
| 5. | Richard Paterno | Will testify as to the circumstances of Plaintiff's decision to take the Regional Sales Director position and remain in Cincinnati.  Will also testify about his own employment agreement with Defendants, the general employment practices at Defendants and in the shoe industry, and his discussions with Plaintiff about Plaintiff's employment with Defendants. |
| 6. | Aida Tejero-DeColli | Will testify as to certain aspects the decision to reduce force and circumstances leading to the termination of Plaintiff's employment. |
| 7. | Howard Kerstine | Plaintiff.  Will testify as to all aspects of his employment and claims herein. |

APPENDIX C

JOINT EXHIBITS

## APPENDIX D

### Plaintiff's Exhibits

**Exhibit 1**    A list of names, positions and dates of birth of Easy Spirit sales staff at the time of the August 2001 RIF.

**Exhibit 2**    A list of proposed terminations prepared by Nine West Human Relations dated July 5, 2001.

**Exhibit 3**    A list of Easy Spirit employees as of August 1, 2001, which contained the word "eliminated" after the names of eleven employees with a line through the word "eliminated" after the names of Amy Castro, age 27, and Robert Deaton, age 39, who transferred to fill openings and Amy Nelson, age 26, who was listed as "transferred."

**Exhibit 4**    An email from Jackie Orris, Nine West Human Resource Director concerning discussions with Melissa Saraco about what jobs are open for transfer.

**Exhibit 5**    A form showing Suzanne Fonarow with starting date of August 13, 2001 as Director of Sales & Marketing for Enzo.

**Exhibit 6**    A copy of Defendant's Answer to Plaintiff's Interrogatory Number 6.

**Exhibit 7**    Defendants' memorandum of meeting to discuss August 2001 RIF.

**Exhibit 8**    Chart prepared by Plaintiff showing the Easy Spirit Sales organization as of August 20, 2001.

**Exhibit 9**    Letter of Defendants' Counsel Patricia Lind, dated September 14, 2001.

**Exhibit 10**    Authorization Form showing Suzanne Fonarow, age 44, starting as Director of Sales & Marketing for Enzo on August 13, 2001.

**Exhibit 11**    List of 24 Nine West employees slated for layoff in August 2001, including three who were subsequently transferred to fill openings and were not terminated: Bob Deaton, age 39; Amy Castro, age 27; and Abiba Kindo, age 22.

**Exhibit 12**    List of Nine West employees slated for layoff, listed by division.

**Exhibit 13**    Map prepared by Plaintiff showing Easy Spirit Regional Sales Directors ("RSDs") prior to August 7, 2001.

**Exhibit 14**    List of employees prepared by Defendants including those employees eligible to participate in August 2001 Nine West severance program and indicating those selected for layoff and those not selected for layoff.

**Exhibit 15**    Transcript of a phone conversation identified by Plaintiff as placed by company officials Orris and Schreck to Plaintiff on August 7, 2001.

**Exhibit 16**    Identification of three open positions with salary over $85,000 within Easy Spirit Division during the period of June 1, 2001 to January 1, 2002.

| Exhibit 17 | Identification of the Easy Spirit Sales force, employee salaries, territories, and sales volume.  Identifies the nine employees "eliminated" and three employees originally listed who were transferred to openings: Amy Nelson, age 25; Bob Deaton, age 39; and Amy Castro, age 27. |
| --- | --- |
| Exhibit 18 | List of the Human Resource Representatives assigned to notify those let go.  Includes Aida Tejero-DeColli, HR Vice President for Jones Apparel, who was assigned to two Easy Spirit employees. |
| Exhibit 19 | Nine West Associate Change Forms showing 14 Nine West employees transferred in July, August, September and October 2001. |
| Exhibit 20 | Nine West Associate Change Forms showing transfer of 11 employees at various times in 2001 and 2002. |
| Exhibit 21 | Termination Guide dated August 7, 2001 containing speech to be given to terminated employees. |
| Exhibit 22 | List of those still working for Easy Spirit as of November 2002 and a listing of those who left during the period 1998 through 2002. |
| Exhibit 23 | List of Nine West terminations during the years 2000 and 2002. |
| Exhibit 24 | List showing sales numbers for Easy Spirit RSDs and Account Executives in 2000. |
| Exhibit 25 | List of Easy Spirit staff as of July 2002 showing the RSD position has been abolished.  All RSDs are now called Sales Executives along with the other Account Executives.  It also shows Anne Morrissey and Helene Whitney as having filled Vice President positions since August 7, 2001. |
| Exhibit 26 | List of 2000 Gross Shipments by Salesperson for Easy Spirit. |
| Exhibit 27 | List of Account Coordinators including those laid off August 2001. |
| Exhibit 28 | Organizational chart of Easy Spirit prepared sometime between May 1, 2001 and August 31, 2001.  Shows the RSD position vacated by Ward as "open" and the Director of Sales position as also "open." |
| Exhibit 29 | Self-appraisal of Plaintiff for period February 1999 through December 1999. |
| Exhibit 30 | 1997 to 1998 Annual Performance Appraisal of Plaintiff indicating Plaintiff's performance against basic job accountabilities for 1996 in comparison to 1997. |
| Exhibit 31 | Shipping report of Plaintiff for the first six months of 2001 indicating high performance. |
| Exhibit 32 | March 3, 2001 Self-Appraisal form for Plaintiff. |
| Exhibit 33 | Chart indicating Easy Spirit Job Descriptions. |
| Exhibit 34 | Easy Spirit Team Responsibilities for accounts. |
| Exhibit 35 | List of shipments for Plaintiff's & Deaton's Region as of July 21, 2001. |

| | |
|---|---|
| Exhibit 36 | Plaintiff diary excerpt dated October 30, 1999. |
| Exhibit 37 | Map prepared by Plaintiff showing sales staff prior to August 7, 2001. |
| Exhibit 38 | Map prepared by Plaintiff showing sales staff prior to August 7, 2001 with additional handwritten corrections. |
| Exhibit 39 | Chart prepared by Plaintiff showing sales force as of July 1, 2001. |
| Exhibit 40 | Letter from Patricia Lind dated October 18, 2001. |
| Exhibit 41 | List of Nine West employees terminated August 2001. |
| Exhibit 42 | List of Order Entry employees. |
| Exhibit 43 | Declaration of Howard Kerstine. |
| Exhibit 44 | List of the Midwest Division for 1998 showing $22,578,589 in shipments to stores in Plaintiff's area, which he shared the responsibility for servicing. |
| Exhibit 45 | Plaintiff's 1998 Annual Performance Appraisal. |
| Exhibit 46 | Plaintiff's performance report for 1997, showing exceptional performance with department stores. |
| Exhibit 47 | Letter of praise from Nine West's Manager Brenda Lauderback to Plaintiff concerning his work with the Belk Department Store chain. |
| Exhibit 48 | Plaintiff's analysis of what happened to Easy Spirit personnel based on his personal knowledge and company records furnished. |
| Exhibit 49 | Form showing the effective date of Kyri Fujiwara's promotion to the position of Regional Sales Director was August 13, 2001 around the time of Plaintiff's termination on August 7, 2001. |
| Exhibit 50 | Portions of Plaintiff's diary. |
| Exhibit 51 | Declaration of Jerry Hemphill. |
| Exhibit 52 | Declaration of James Hurley. |
| Exhibit 53 | Declaration of Arthur Parks. |
| Exhibit 54 | Declaration of Robert Stix. |
| Exhibit 55 | Letter of Grenier dated April 22, 2003 containing dates of birth of various employees. |
| Exhibit 56 | Plaintiff's damage calculation showing $356,134.99 to November 30, 2003. |

## APPENDIX E

### DEFENDANTS' EXHIBITS

500. Plaintiff's U.S. Shoe Application for Employment, dated 12/21/92 (attached to Defendants' Memorandum of Law in Support of Motion for Summary Judgment at Tab 2).

501. Nine West Group Inc.'s Associate Handbook (effective January 1998) (attached to Defendants' Memorandum of Law in Support of Motion for Summary Judgment at Tab 3).

502. List of Names, Positions and Dates of Birth of Easy Spirit Wholesale Sales Staff at Time of August 2001 Reduction in Force (attached to Defendants' Memorandum of Law in Support of Motion for Summary Judgment at Tab 1).

503. Easy Spirit 2000 Gross Cost Shipments by Salesperson (Confidential) (attached to Declaration of Muriel Schreck in Support of Motion for Summary Judgment as Attachment 2).

504. Chart identifying division's savings from the position eliminations and identifying how to shift accounts (attached to Declaration of Muriel Schreck in Support of Motion for Summary Judgment as Attachment 3).

505. Plaintiff's Annual Performance Appraisal – Self (Review Period: 1996).

506. Plaintiff's 1997/1998 Annual Performance Appraisal – Self.

507. Plaintiff's 1998 Annual Performance Appraisal – Self.

508. Plaintiff's Regional Sales Director Self Appraisal (Review Period: 2/99 to 12/99).

509. Plaintiff's 2/13/94 personal journal entry regarding concerns about promotion of Rick Paterno over Plaintiff.

510. Plaintiff's 2/19/94 personal journal entry regarding Plaintiff's concerns about discrimination against males and older workers.

511. Plaintiff's 1/21/95 personal journal entry regarding Plaintiff's discussions with Rick Paterno about Noel's preference for younger workers.

512. Plaintiff's 3/1/97 personal journal entry regarding Plaintiff's discussion with Rick Paterno about Plaintiff's decision to take the Regional Sales Director job in Cincinnati.

513. Plaintiff's 3/1/97 personal journal entry regarding Plaintiff's discussion with Joe Dzialo about Plaintiff's decision to take the RSD position in Cincinnati.

514. Plaintiff's 5/15/97 personal journal entry regarding "My Future," discussing staying on as V.P. Sales while still living in Cincinnati.

515. Plaintiff's 5/24/97 personal journal entry regarding "My Future," discussing second conversation with Rick Paterno regarding Plaintiff staying on as V.P. Sales while continuing to live in Cincinnati.

516. Plaintiff's 11/22/97 personal journal entry regarding discussions with Rick Paterno and Joe Dzialo regarding office space in White Plains and Plaintiff's future if Paterno left company.

517. Plaintiff's 5/16/98 personal journal entry regarding conversation with Rick Paterno about Plaintiff's decision whether to stay on as V.P. Sales (coming to White Plains twice per week) or take the RSD position in Cincinnati.

518. Plaintiff's 7/30/98, 7/31/98 and 8/1/98 personal journal entries regarding Plaintiff's decision to take the RSD position.

519. Plaintiff's 12/12/98 personal journal entry regarding job offer to Plaintiff from Penobscott and Plaintiff's decision to "abdicate" his V.P. Sales position.

520. Plaintiff's 12/18/98 personal journal entry regarding his "Abdication Voice Mail."

521. Plaintiff's 10/26/99 personal journal entry regarding call from Rich Demma regarding job offer at Selby and Plaintiff's readiness to leave Easy Spirit.

522. Plaintiff's 10/30/99 personal journal entry regarding Plaintiff's discussion with Rick Paterno about Plaintiff having no major department stores left in his region, and Paterno's statement that he intended to protect Plaintiff and Plaintiff's RSD position.

523. Plaintiff's 2/9/00 personal journal entry regarding Plaintiff's meeting with Rich Demma and Colleen Hanley about Executive V.P. position with Old Maine Trotter.

524. Plaintiff's 2/11/00 personal journal entry regarding Plaintiff's discussions with Rich Demma about Old Maine Trotter job, including salary and fact no employment contract.

525. Plaintiff's 2/13/00 personal journal entry regarding demand for more money and "three year no cut clause contract" to take Old Maine Trotter.

526. Plaintiff's 2/19/00 personal journal entry regarding Rich Demma's request Plaintiff reconsider Old Maine Trotter job, which Plaintiff declined.

527. Plaintiff's 2/24/01 personal journal entry regarding discussions with Rick Paterno about Paterno's desire to leave Easy Spirit, and impact Paterno leaving has on Plaintiff's job security.

528. Plaintiff's 3/3/01 Self Appraisal for himself and Bob Deaton.

529. Plaintiff's 4/12/01 and 4/17/01 personal journal entry regarding Plaintiff's Rick Paterno leaving and Mim Schreck taking over as President of Easy Spirit.

530.   Plaintiff's 5/12/01 personal journal entry regarding discussions with Glen Ward about Plaintiff's "deal" with Paterno.

531.   Plaintiff's 5/17/01 personal journal entry regarding Elder Beerman being put on credit hold and the negative implications that has on Plaintiff's employment.

532.   Nine West Group Inc. Organizational Chart – 2001, Easy Spirit Wholesale.

533.   Plaintiff's 5/30/01 personal journal entry regarding fears Mim Schreck intended to cut size of sales force.

534.   Plaintiff's 6/5/01 personal journal entry regarding Plaintiff's concern his position might be eliminated and his hope for a severance package.

535.   Plaintiff's undated personal journal entry entitled "How I Might Spend My Early Retirement Years" detailing Plaintiff's plans for retribution against Defendants if he was laid off.

536.   Plaintiff's 8/5/01, 8/8/01 and 8/12/01 personal journal entries regarding Plaintiff's reaction to the elimination of his position by Nine West.

537.   Plaintiff's prepared notes for telephone call with Mim Schreck on August 7, 2001 (entitled "Conversation on Aug. 7, 2001"), with Plaintiff's handwritten notes included.

538.   Plaintiff's notes regarding substance of Plaintiff's telephone with Mim Schreck and Jackie Orris (entitled "Transcript – svd as trnscrpt – Phone conversation Dtd Aug 7, 2001/12:30 PM").

539.   Plaintiff's 8/7/01 personal journal entry entitled "Memo for Record" regarding follow-up telephone call with Jackie Orris.

540.   Plaintiff's 8/25/01 personal journal entry regarding Plaintiff's job search efforts.

541.   Plaintiff's 9/4/01 and 9/8/01 personal journal entries regarding sales structure and continued job search, respectively.

542.   Plaintiff's 9/16/01 personal journal entry regarding job search.

543.   Plaintiff's 9/21/01 personal journal entry regarding job search.

544.   Plaintiff's undated personal journal entry regarding offer of employment from National Shoe Retailers Association to be President.

545.   Plaintiff's 1/5/02 and 1/6/02 personal journal entries regarding Plaintiff's dislike for NSRA position, but belief it gives credence to age discrimination claim against Defendants.

546.   Plaintiff's 3/26/02 personal journal entry regarding decision to retire from NSRA and Plaintiff's "Draft Notes on potential position with NSRA" regarding consulting position.

547. Plaintiff's 4/4/02 personal journal entry regarding inquiry from Greg Tunney of Daniel Green as to Plaintiff's interest in starting a new division.

548. Plaintiff's 4/19/02, 4/22/02 and 5/15/02 personal journal entries regarding Plaintiff's discussions and negotiations with Mark Lemp for new job.

549. Plaintiff's 5/6/02 personal journal entry regarding Plaintiff's new position with Mark Lemp.

550. Declaration of Muriel "Mim" Schreck.

551. Declaration of Sandra Rogan.

552. Declaration of Jackie Orris.

553. Declaration of Kyri Fujiwara.

APPENDIX F

PORTIONS OF DEPOSITIONS
TO BE OFFERED BY PLAINTIFF

| DEPONANT'S NAME | PAGE NUMBER(S) |
|---|---|
| Kerstine, Howard | 7-9, 11-12, 13-14, 17, 23, 30, 31, 32, 36, 44-46, 71-71-72, 78, 78-79, 80-81, 81, 86, 87, 89, 93-95, 107, 107, 107-109, 107-108, 108, 110, 113, 135, 136, 184, 192, 196 |
| Kerstine, Howard #2 | 35, 46 |
| Itzkowtiz, Susan | 8, 9, 12, 14, 17, 44, 44-45, 44-46, 45, 47, 49 |
| Ward, Geoffrey | 8-11, 10-11, 17, 24, 38, 38-39, 39-40, 41-42, 43, 45, 45-47, 50, 73, 83, 86, 94-95, 105 |
| Paterno, Rick | 12, 24, 26-27, 30, 31-33, 34-35, 35, 35-36, 36-37, 37, 42-43, 43-44, 45 |
| Schreck, Muriel "Mim" | 18-19, 26, 44, 104, 113-114, 114, 179-180, 185-186 |
| Orris, Jackie | 25, 26, 27, 28, 29, 29-30, 34, 44-45, 48, 48-50, 50, 57, 65, 65-66, 66, 92, 96 |

APPENDIX G

PORTIONS OF DEPOSITIONS
TO BE OFFERED BY DEFENDANTS

| DEPONENT'S NAME | PAGE NUMBER(S) |
|---|---|
| Itzkowtiz, Susan | 1, 4, 5, 7-10, 12-14, 16-18, 25, 26, 30-34, 35-36, 39-40, 43-50, 52-53, 54-55, 58-61, 64-65, 67, 68-72 |
| Ward, Geoffrey | 1, 4, 8-12, 13, 24-25, 29-32, 34-37, 38-41, 42, 43, 44-48, 50, 53-54, 58, 60-61, 70-74, 78, 79, 83, 86, 87, 101-102 |
| Paterno, Richard | 1, 11, 12, 15-17, 18-19, 23-29, 30-38, 39-44, 45-48 |
| Schreck, Muriel "Mim" | 1, 6, 7,9, 13-14, 17-23, 25-30, 33-37, 41-47, 48-50, 57, 58, 63, 64, 67, 68, 71,80, 87, 88, 90, 91, 92, 99-101, 106, 113, 114-120, 123, 126-127, 133, 134, 139, 141-144, 146-148, 150, 172, 173, 179, 180, 185, 186 |
| Orris, Jackie | 1, 4, 5, 6, 11, 18-20, 24-30, 34-46, 48-53, 57-58, 61, 65-76, 80, 81, 85-99, 102, 103, 105-107, 109, 114, 120 |
| Howard Kerstine | 1, 6-15, 16-18, 22-24, 30-32, 34, 44-48, 50-57, 59, 63-67, 71, 72, 78-81, 85-90, 92-96, 105-111, 113, 114-120, 126-129, 134-140, 142, 147, 148, 161-164, 183-185, 191-199, 200-20, 207, 208-209, 221-224 |
| Howard Kerstine #2 | 1, 15, 16, 34-38, 45-47 |
| Aida Tejero-Decolli | 1, 2, 8-23, 24, 25, 26-30, 31-38, 43-46, 47-50 |

I:\Clients\N\Nine West\Kerstine\Pleadings\REVISED - Tobias Joint Pretrial Order.doc